# United States Court of Appeals
## For the First Circuit

No. 06-1173

VJOLLCA DINE; VASIL TRESKA,

Petitioners,

v.

ALBERTO R. GONZALES,
Attorney General of the United States,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Lynch, and Howard,
Circuit Judges.

Fatos Koleci on brief for petitioners.
Phillip M. Seligman, Trial Attorney, Civil Division, Peter D. Keisler, Assistant Attorney General, Civil Division, and Terri J. Scadron, Assistant Director, Office of Immigration Litigation, Civil Division, on brief for respondent.

September 27, 2006

**LYNCH**, **Circuit Judge**. Petitioners Vjollca Dine ("Dine") and her husband, Vasil Treska ("Treska"), seek review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial of their application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") specifically noted that he found Treska and his daughter, Krisida Treska ("Krisida"), not to be credible witnesses. The BIA upheld the IJ's adverse credibility determinations; it also affirmed the IJ's conclusion that Treska and Dine failed to establish a nexus between the events in question and a statutorily protected ground under 8 U.S.C. § 1101(a)(42). We affirm the BIA and deny the petition for review.

I.

On September 18, 1994, petitioners Dine and Treska attempted to enter the United States with Albanian passports and non-immigrant visas. In an interview with an immigration inspector, Treska stated that he was not making any claim to United States citizenship and that he was visiting for the purpose of attending his brother's wedding. Treska and Dine were denied entry and placed into exclusion proceedings. On November 18, 1994, they admitted excludability, and on December 30, 1994, they filed an application for asylum and withholding of removal, claiming past persecution on the basis of religion, nationality, and political opinion.

At the exclusion proceedings on June 30, 1995, Treska testified to his being Christian Orthodox, ethnic Romanian, and a member of the Democratic Party in Albania. He reported that his father's bakery had been taken over by the government in 1967, that Muslims made up the majority of the government and received preferential treatment, and that Christians had been kept from rebuilding the church in his hometown. Dine did not testify at the exclusion proceedings.

On June 14, 1996, the IJ issued an oral decision denying the petitioners' application for asylum and withholding of removal. The IJ concluded that the applicants "ha[d] not met their burden of establishing that if they were to return to Albania that they w[ould] be persecuted or have a well-founded fear of persecution" on account of one of the five statutorily protected grounds.[1] Treska and Dine appealed this decision, and the BIA dismissed the appeal on May 15, 2001.

Shortly thereafter, the petitioners' daughter, Krisida, arrived in the United States on September 8, 2001, having presented herself for admission under the Visa Waiver Pilot Program under a different name. Immigration authorities intercepted and detained her.

---

[1] The statutorily protected grounds are "race, religion, nationality, membership in a particular social group, [and] political opinion." 8 U.S.C. § 1101(a)(42)(A).

On October 11, 2001, Treska and Dine filed a motion with the BIA to reopen or reconsider its decision of May 15, 2001, on grounds that "country conditions in Albania had significantly changed since the [petitioners] escaped from [there]." Treska and Dine also submitted a second application, dated October 1, 2001, seeking asylum and withholding of removal, as well as protection under the CAT. The government did not oppose the motion to reopen, and on November 30, 2001, the BIA granted the motion and ordered further proceedings before the IJ.

On July 6, 2004, Treska and his daughter, Krisida, testified about events on which the petitioners' persecution claims were based. Neither witness testified about the changed country conditions that originally formed the basis for the petitioners' motion to reopen; instead, each testified about a kidnapping and threats against Krisida while she was living in Albania. The petitioners claimed that the kidnapping and threats were the direct result of their financial donations to the Democratic Party of Albania.

Treska testified that in May or June 2001, Dine sent $2,000 to her parents in Albania so that they could give the money to the Democratic Party. According to Treska, Dine's parents did so, and Dine's contribution was later mentioned at a public demonstration. After this announcement, Treska's parents, who

remained in Albania, started receiving threats and insulting phone calls.

Treska also testified that on July 15, 2001, Treska's mother received an anonymous letter requiring her to pay $15,000 by July 20, 2001; if she did not deliver the money, Krisida would "disappear."[2] Treska explained that his mother reported the letter to the police, but the police gave "a negative response" because she was unable to tell them who had sent the letter in the first place. Treska and Dine decided that Krisida should stay with Dine's uncle in a nearby town. Treska testified that he and his wife sent $15,000 to Albania with somebody who was traveling from the United States to Albania. The money arrived in Albania on July 22, 2001. That same morning, Krisida was abducted by two men wearing masks while she was playing outside her uncle's home. According to Treska, the $15,000 eventually reached Treska's mother, who then personally delivered the ransom in exchange for Krisida's return on July 23, 2001.

Treska then testified that on August 27, 2001, his mother received another letter, this time demanding $10,000 or else Krisida would be killed. The letter indicated that payment was due by September 5. Instead of paying the ransom, Treska's mother arranged Krisida's departure to the United States. Treska stated

---

[2] The letter, translated into English, threatened to kidnap "[y]our niece," apparently referring to Krisida, who was living with her grandparents at the time.

that the kidnappers threatened his mother when they found out that Krisida had left the country, but he also reported that no actual harm had come to her.

Krisida testified that she was eleven years old at the time of her kidnapping. She reported that she was playing outside her uncle's house just before she was kidnapped. Two masked men jumped out of a car and grabbed her, and then took her by car to the basement of an old house. When it was dark outside, the men came back and drove Krisida to her grandmother's house. Krisida testified that the men "left [her] at the end of the street" and that she walked to the house by herself. She made clear that upon her return, her grandmother did not speak with her abductors or give them anything.

After the hearing, the IJ issued an oral decision denying Treska's and Dine's application for asylum, withholding of removal, and relief under the CAT. The IJ found neither Treska nor Krisida to be credible, citing their demeanor in court and inconsistencies in Treska's testimony relative to Krisida's testimony and documentary evidence. Furthermore, the IJ found no nexus between the alleged kidnapping and one of the five statutorily protected grounds, commenting that there was no evidence as to the motives of the kidnappers. With respect to the asylum and withholding claims, the IJ concluded that Treska and Dine had failed to demonstrate either past persecution or a well-founded fear of future

-6-

persecution. With respect to the CAT claims, the IJ found that Treska and Dine had failed to show that torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." Treska and Dine appealed to the BIA.

On December 22, 2005, the BIA dismissed the petitioners' appeal. The BIA affirmed the IJ's adverse credibility determinations as well as his conclusion that Treska and Dine failed to establish a nexus between Krisida's kidnapping and a protected ground. Treska and Dine now petition for review by this court.

## II.

The petitioners challenge the IJ's adverse credibility determinations as well as his finding that there was no nexus between Krisida's kidnapping and their political views. They also argue that they must prevail on their asylum claims because an IJ in a different proceeding granted Krisida asylum on identical facts.[3] Because we hold that the IJ's adverse credibility determinations were supported by substantial evidence, we deny the petition for review.

In immigration cases, our review is deferential with respect to findings of fact, including the credibility of witnesses. See Chen v. Gonzales, 418 F.3d 110, 113 (1st Cir.

---

[3] Krisida's asylum claim was granted on March 11, 2005.

-7-

2005); <u>Singh</u> v. <u>Gonzales</u>, 413 F.3d 156, 159 (1st Cir. 2005).  We must affirm factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  <u>INS</u> v. <u>Elias-Zacarias</u>, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (internal quotation marks omitted).  Put another way, the factual finding must stand "unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).

In this latest round of proceedings, Dine and Treska sought asylum, withholding of removal, and protection under the CAT based on the claim that their daughter, while still in Albania, was threatened and abducted because of their political views.  However, the IJ found Treska's and Krisida's testimony to be incredible, and he supported this determination with a number of subsidiary findings.  For example, the IJ found it highly suspect that the petitioners decided at their hearing to focus entirely on Krisida's kidnapping, even though their motion to reopen proceedings -- which was filed on October 5, 2001, <u>after</u> the alleged abduction -- made no mention of the $2,000 payment to the Democratic Party of Albania, the public announcement of the donation, the threatened kidnapping, the actual kidnapping, the ransom payment, or the demand for additional payment.  When asked during the proceeding why these events were not recounted in the motion to reopen, Treska explained that he and his wife filed the motion through a different

-8-

attorney and that they had in fact explained these events to him. Treska was unclear, however, about whether the previous attorney had gone over the contents of the motion to reopen with him and his wife, first appearing to say "yes" and then later saying "no."

The IJ also found it highly suspect that the events in question all happened shortly after the BIA's denial of the petitioners' appeal on May 15, 2001. Indeed, Treska testified that Dine had sent the $2,000 to her mother in May or June 2001. By early September 2001, the petitioners' daughter had arrived in the United States, and in October 2001, they filed their petition to reopen.

Furthermore, the IJ noted inconsistencies between Treska's testimony and the documentary evidence before the court. In particular, the IJ was concerned by Treska's testimony that the second threat against his daughter occurred on August 27, 2001; a police record with an authenticated signature indicates that Treska's mother reported the second threat on July 27, 2001. When confronted with this discrepancy, Treska suggested that the police report could have contained a typographical error, an explanation that the IJ found unconvincing.

The IJ additionally took issue with Treska's evasiveness when asked how he received one of the ransom notes, as well as with his non-responsiveness when the government asked exactly how he transported $15,000 in cash to Albania. The IJ noted that Treska's

parents continue to live unharmed in Albania, despite the threats his mother reportedly received after Krisida's departure for the United States. Furthermore, the IJ highlighted the discrepancies between Treska's testimony and Krisida's testimony regarding the circumstances of Krisida's return to Treska's mother's house.

The IJ provided "specific, cogent reason[s] for [his] disbelief," Gailius v. INS, 147 F.3d 34, 47 (1st Cir. 1998) (quoting Turcios v. INS, 821 F.2d 1396, 1399 (9th Cir. 1987)) (internal quotation marks omitted), and we cannot say that either the IJ or the BIA erred in finding the testimony of Treska and Krisida incredible.

The adverse credibility determinations defeat the petitioners' asylum claims. We have noted that "[w]hen a petitioner's case depends on the veracity of . . . testimony, a fully supported adverse credibility determination, without more, can sustain a denial of asylum." Olujoke v. Gonzáles, 411 F.3d 16, 22 (1st Cir. 2005). This is such a case. The petitioners' claims depend on the veracity of the testimony given by Treska and his daughter, Krisida. In light of the adverse credibility determinations, we hold that there is substantial evidence to support the conclusion that Treska and Dine failed to show either past persecution or a well-founded fear of future persecution.

Our affirmance of the denial of petitioners' asylum claims effectively disposes of their withholding of removal claims.

-10-

See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004) ("A claim for withholding of deportation demands that the alien carry a more stringent burden of proof than does an asylum claim. Thus, if an alien cannot establish asylum eligibility, his claim for withholding of deportation fails a fortiori.").

Because the petitioners' brief does not advance any arguments regarding the CAT, we deem that these claims have been waived. See Mediouni v. INS, 314 F.3d 24, 28 n.5 (1st Cir. 2002).

The petition for review is denied.