# United States Court of Appeals

## For the First Circuit

No. 07-1273

VLLASI CUKO,

Petitioner,

v.

MICHAEL B. MUKASEY,[*] ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Torruella, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

Michael D. Greenberg and Law Offices of Michael D. Greenberg on brief for petitioner.
Robbin K. Blaya, Attorney, Office of Immigration Litigation, U.S. Department of Justice, Peter D. Keisler, Acting Attorney General, Anthony W. Norwood, Senior Litigation Counsel, on brief for respondent.

March 31, 2008

---

[*]Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Michael B. Mukasey has been substituted for former Attorney General Alberto R. Gonzáles as the respondent herein.

**LYNCH**, **Circuit Judge**.  Vllasi Cuko, a citizen and national of Albania, petitions for review of an order of the Board of Immigration Appeals (BIA), which affirmed an immigration judge's (IJ) denial of his application for political asylum.

## I

### BACKGROUND

After Cuko entered the United States via Italy in July 2001, he was placed in removal proceedings and filed an application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), predicated on allegations of persecution based on his political opinions.  At the removal hearing, Cuko testified that the former Communist government of Albania forcibly interned his family in a concentration camp during the 1970s and 1980s.  After the fall of the Communist government in 1990, Cuko became an active member of his hometown chapter of the Democratic Party.  The Democratic Party's major political opponent is the Socialist Party, the legal successor to the Albanian Communist Party.

Cuko also testified that, in November 2000, he allowed his official membership in the local chapter of the Democratic Party to lapse because he had decided to sell his home and relocate his family to the capital, but that he ultimately was unable to acquire a new house.

Cuko testified that, in February 2001, he helped to

organize, and participated in, a Democratic Party election rally in Fier. Later that evening, his house was stoned and his family terrorized by unknown masked individuals. Shortly thereafter, Cuko and his wife began receiving anonymous telephone threats that their son would be kidnapped if Cuko did not cease his activities with the Democratic Party, and Cuko paid to have his wife and son smuggled into the United States. When Cuko held another party rally on March 21, the police – who, Cuko claims, are all Socialist Party supporters – arrested him, held him for several hours, and insulted and beat him. When the Democrats lost the election to the Socialists, Cuko sold his house, then left for the United States via Italy.

The IJ denied Cuko's application for asylum and withholding of removal and his claim for relief under the CAT. In an oral decision, the IJ began by noting that Cuko's testimony was inconsistent, both internally and with some exhibits, and that his demeanor suggested mendacity.

The IJ then described the present country conditions in Albania and noted that there were no longer any indications of systemic political persecution against Communist Party opponents. The IJ found that even if he credited Cuko's account that he and his family were interned in a labor camp in the 1970s, virtually all Albanians suffered similarly from the years 1945 to 1990. Therefore, even if Cuko could credibly show past persecution, the

presumption of a well-founded fear of future persecution would be overcome by the changed country conditions.

The IJ further noted that he did "not . . . find the applicant to be a credible witness in any regard in this case. [The IJ] has carefully observed the applicant's demeanor throughout this hearing and finds the applicant to be a furtive, evasive, and wholly incredible witness."

The IJ then specifically detailed the bases for his adverse credibility determination. First, the IJ noted that Cuko testified that, after he had arrived in the United States, he asked his father-in-law in Albania to obtain Cuko's party membership card from the Democratic Party archives and mail it to him. Moments later, Cuko "completely changed his testimony" to say that he had left the card at his home when he departed Albania. Immediately thereafter, he changed his testimony again and said that he had given the card to his father-in-law before departing for the United States. The IJ noted, in particular, that based on Cuko's demeanor, Cuko seemed to modify his second answer as soon as he realized that it was inconsistent with his earlier testimony that he had sold his home before leaving Albania. "[I]t actually appeared that [Cuko] was giving answers then realizing that his prior testimony conflicted with these answers, and he would then change his answer and give another one that he thought would be more plausible and so on until he ended up with the final version

-4-

of his testimony." The IJ noted that Cuko had also not appropriately authenticated the membership card even though it was clear that Cuko was well aware of the procedures for authentication.

Second, the IJ observed that a certificate dated December 28, 2001, from the local Democratic Party branch office, which certified that Cuko "has been a member of this party from 1992 till [sic] November of the year 2000 and has regularly paid the monthly membership fees to the party," contradicted Cuko's testimony that he was an active and vibrant Democratic Party member and organizer through his arrest in March 2001.

The IJ also rejected, as "wholly unsatisfactory," Cuko's explanation for the November 2000 membership termination: that he had intended to move to another town and reregister with its local Democratic Party branch, but that he ultimately failed in his efforts to buy a new house in the other locality, and decided to stay in Fier. If this were true, the IJ noted, it would be likely that the letter would have mentioned that he had remained active, especially in light of his purported efforts as an organizer up until his arrest in March 2001.

In addition, the IJ determined it "inconceivable" that the December 2001 certificate, written by the chairman of the local Democratic Party and purportedly issued after the alleged harassments, assaults, arrest, and beatings of Cuko in the spring

-5-

of 2001, never mentioned this persecution.

The IJ found that these two discrepancies and inconsistencies were material and went to the heart of the applicant's asylum claim and that in light of them, Cuko could not be found to be a credible witness.

Finally, the IJ noted other discrepancies. Cuko's testimony about how much and when Cuko paid to have his wife and child smuggled out of Albania changed from one moment to the next and directly contradicted the testimony of his wife. His demeanor was "completely evasive and nonresponsive" when he was testifying as to the source of the money used to pay the smugglers. Cuko appeared to say that he sold one of the two houses he owned to raise the money, but his wife clearly testified that they owned only one home in Albania. The IJ also noted that the timing of the sale of the house was "completely unclear" to the IJ. The IJ found Cuko's testimony "simply . . . not . . . to be credible" on this point, and that "the truth is something other than the applicant's testimony, that is, that the applicant and his family had plans to come to the United States, and they have concocted this story in an effort to obtain lawful permanent residence . . . ."[1]

---

[1]The IJ also noted that (i) Cuko's wife's demeanor was "exceptionally evasive," "furtive," and that she was "wholly incredible"; (ii) Cuko's wife's stated reason for the family's coming to the United States – viz., to enjoy "greater opportunities" – was inconsistent with Cuko's contention that the family was fleeing political persecution; and (iii) Cuko did not explain adequately why the family did not try to emigrate to nearby

The IJ concluded that these discrepancies became material in combination with Cuko's other perjurious testimony regarding his party membership card and the December 2001 certificate.

The IJ, having rejected the application for asylum, rejected Cuko's claim for withholding of removal, noting that the latter requires a higher burden of proof. The IJ also rejected Cuko's claim for relief under the CAT, based both on his finding that Cuko was not credible and that there was no record support that it was more likely than not Cuko would be tortured were he to return to Albania, especially given the country's changed political circumstances.

After Cuko appealed the IJ's decision, the BIA affirmed and adopted the IJ's decision "finding the applicant not credible," in a brief, but not summary, opinion. Based on an examination of the record, the BIA disposed of Cuko's contention on appeal that the IJ's conduct in questioning Cuko went beyond his authority. The BIA also found sufficient record support to uphold the IJ's adverse credibility finding. The BIA affirmed the finding that based on State Department country reports, Cuko did not have a well-founded fear of future persecution. Cuko then petitioned for review of the BIA's final decision.

---

Greece, where his two daughters were living peacefully.

## DISCUSSION

Cuko's petition argues that the BIA erred in sustaining the decision of the IJ denying Cuko asylum, withholding of removal, or relief under the CAT. He claims again that the IJ improperly assumed the role of a government attorney. He argues the IJ's adverse credibility determinations, which the IJ based on his perceptions of testimonial inconsistencies and witnesses' demeanors, and upon which he founded his denial of Cuko's asylum application, are not supported by the record.

"Where, as here, 'the BIA adopted and affirmed the IJ's ruling, but also discussed some of the bases for the IJ's opinion, we review both the IJ's and BIA's opinions.'" Lin v. Gonzales, 503 F.3d 4, 6-7 (1st Cir. 2007) (quoting Zheng v. Gonzales, 475 F.3d 30, 33 (1st Cir. 2007)). When the BIA adopts the IJ's decision, we cannot disregard the particular findings of the IJ just because the BIA does not expressly address them. See, e.g., Chanthou Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008) (reviewing both the IJ's and the BIA's opinion when the BIA adopts and affirms the IJ's ruling and discusses "some of the IJ's bases for decision"); Lin, 503 F.3d at 6-7 (same); Yu v. Gonzales, 502 F.3d 17, 19 (1st Cir. 2007) (same); Zheng, 475 F.3d at 33 (same).

## A.     Adverse Credibility Determination

"Where the BIA has adopted the IJ's credibility

determination, as here, we review the determination of the IJ." Mewengkang v. Gonzales, 486 F.3d 737, 739 (1st Cir. 2007); see also, e.g., Chanthou Hem, 514 F.3d at 69.

Since the IJ has the best vantage point from which to assess the witnesses' testimonies and demeanors, we accord significant respect to these witness credibility determinations. Afful v. Ashcroft, 380 F.3d 1, 4 (1st Cir. 2004). Accordingly, we review the IJ's adverse credibility determination under the deferential "substantial evidence" standard, and must sustain it "unless the record evidence would compel a reasonable factfinder to make a contrary determination." Stroni v. Gonzales, 454 F.3d 82, 87 (1st Cir. 2006) (emphasis added). Specifically, we narrowly inquire whether: (i) the discrepancies articulated by the IJ and/or the BIA are actually present in the administrative record; (ii) the discrepancies generate specific and cogent reasons from which to infer that petitioner or his witnesses provided non-creditworthy testimony; and (iii) petitioner failed to provide a persuasive explanation for these discrepancies. Hoxha v. Gonzales, 446 F.3d 210, 214 (1st Cir. 2006); In re A-S, 21 I. & N. Dec. 1106, 1109 (BIA 1998).

## 1. The Custody Chain of the Democratic Party Membership Card

As the first ground for his adverse credibility determination, the IJ noted that Cuko gave three different accounts as to how he obtained his Democratic Party membership card as a

supporting exhibit.  The IJ also found that Cuko's demeanor led the IJ to believe that Cuko gave the multiple accounts because he recognized the inconsistency between his prior account and his other testimony.

These discrepancies in Cuko's testimony about how he obtained the Democratic Party membership card are clearly present in the administrative record.  They are based not only on inconsistency of statements but also on observation of demeanor.  They also go the heart of Cuko's claim of persecution based on political beliefs.[2]  See Bojorques-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999).  Further, the IJ considered Cuko's explanation for his inconsistencies in testimony, and found it was not credible because his answer appeared to change only after he realized it conflicted with his prior testimony.  See Simo v. Gonzales, 445 F.3d 7, 12 (1st Cir. 2006) ("Our cases make frequent reference to the failure of a petitioner to sufficiently explain inconsistencies."  (citing Chen v. Gonzales, 418 F.3d 110, 113 (1st Cir. 2005); Dhima v. Gonzales, 416 F.3d 92, 96 (1st Cir. 2005))).

Under our deferential standard of review, we cannot say that the record compels us to make a determination contrary to that of the IJ.  The IJ's determination was also based on Cuko's demeanor, and the IJ's findings as to demeanor are subject to great

---

[2]Cuko's petition pre-dates the effective date of the Real ID Act, which abolishes the "heart of the claim" rule.  See Chanthou Hem, 514 F.3d at 69 n.3; see also 8 U.S.C. § 1158(b)(1)(B)(iii).

-10-

weight. See, e.g., Rodriguez Del Carmen v. Gonzales, 441 F.3d 41, 43 (1st Cir. 2006) ("Matters of witness credibility and demeanor are peculiarly for the factfinder.").

### 2. The December 2001 Certificate from Party Chairman

As the second ground for his adverse credibility determination, the IJ observed that the December 28, 2001 certificate, in which the local party chairman certified that Cuko had paid party dues from 1992 through November 2000, contradicted Cuko's testimony that he remained an active Democratic Party member into early 2001, and that Cuko's explanation for terminating his membership (viz., his aborted attempt to purchase a house in Tirana) was "wholly unsatisfactory."

In addition, the IJ found that the December 2001 certificate reasonably should have included (but did not) some account of the political persecution that Cuko purportedly suffered in early 2001. Cuko's explanation that the December 2001 certificate was just a ministerial verification of Cuko's official enrollment dates in the party was undercut by the evidence that the December 2001 certificate did make reference to Cuko's forced labor under the prior Albanian regime. Again, under our deferential standard of review, it was reasonable for the IJ to note the inconsistencies and find Cuko's explanation inadequate.[3]

_____

[3]Even if the December 2001 certificate was only a ministerial verification of Cuko's official enrollment dates in the party, and would not mention Cuko's alleged political persecution, it is at

-11-

Cuko argues that the even if he was no longer an active Democratic Party member, he may still be at risk of political persecution because he was perceived to be a Democratic Party member. It is correct, but not material here, that an asylum claim can be predicated not only on an applicant's actual political affiliation, but on his perceived affiliation with a particular political opinion. See Mekhoukh v. Ashcroft, 358 F.3d 118, 125 (1st Cir. 2004); Alvarez-Flores v. INS, 909 F.2d 1, 4 (1st Cir. 1990) ("[A]n imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the [Immigration and Nationality] Act."); see also Koudriachova v. Gonzales, 490 F.3d 255, 264 (2d Cir. 2007) ("[T]he relevant question is not whether an asylum applicant subjectively holds a particular political view, but instead whether the authorities in the applicant's home country perceive him to hold a political opinion and would persecute him on that basis."); Gao v. Gonzales, 424 F.3d 122, 129 (2d Cir. 2005); 8 C.F.R. § 208.13(b)(2)(iii).

This point is irrelevant to the IJ's determination, however. The IJ used the discrepancy over Cuko's party membership dates as one of many factors, including its finding that "his demeanor suggested mendacity," to find Cuko was personally not

least as plausible to draw the inference the IJ did. Even equally competing inferences do not allow us to unsettle the IJ's determination.

-12-

credible. The IJ's basis of decision was not that because Cuko was no longer a Democratic Party member, he would not have been subject to persecution; it was that because of Cuko's testimonial inconsistencies and demeanor, Cuko did not meet his burden of showing a well-founded fear of persecution.

Further, this was not a case in which Cuko was not afforded an opportunity to explain the inconsistency. See Hoxha, 446 F.3d at 214 (noting that the asylum applicant must provide a persuasive explanation for the purported discrepancies); Zi Lin Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir. 2004) (noting that asylum applicant should be afforded "a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony"). Cuko attempted to explain the inconsistency by his aborted move to Tirana. The IJ found that explanation also to be not credible, and the record does not compel a contrary finding.

### 3. The Testimony Concerning the Cukos' Smuggling Transaction

As another ground for his adverse credibility determination, the IJ cited discrepancies between the testimony of Cuko and his wife concerning details of the transaction by which Mrs. Cuko was smuggled to the United States. Because Cuko's petition pre-dates the effective date of the Real ID Act, our deferential standard of review is subject to an important caveat: "[A]n adverse credibility determination cannot rest on trivia but must be based on discrepancies that involved the heart of the

-13-

asylum claim." Lin, 503 F.3d at 7 (quoting Bojorques-Villanueva, 194 F.3d at 16) (internal quotation marks omitted). The IJ found that these discrepancies as to the smuggling, when combined with Cuko's other testimony, became "material" and went to the heart of his claim. The BIA considered the inconsistencies in the testimony regarding the Cukos' smuggling transaction; while "collateral" to Cuko's claim if viewed alone, they still provided additional support for the IJ's adverse credibility finding. "While these additional discrepancies do not necessarily go to the heart of Lin's persecution claim, and thus might not be enough standing alone to support an adverse credibility finding, . . . in this case they provide further support for the IJ's conclusion that [petitioner] was not candid in her recitation of events." Id. at 8 (citations omitted). The inconsistencies about the funding and selling of the home, which provided the source of money to pay the smugglers, raised issues of credibility regarding Cuko's reasons for fleeing to the United States, which go to the heart of his application. The record does not compel a different conclusion.

### 4. Other Concerns

Cuko argues that the IJ purported to base his adverse credibility decision, in part, on "material inconsistencies and discrepancies between the applicant's written asylum application and his testimony," but then did not, in the remainder of his decision, cite any specific examples of such discrepancies.

-14-

(Emphasis added.)  As described above, the IJ does explain the inconsistencies between Cuko's testimony and the exhibits that Cuko submitted.  Regardless, the IJ had sufficient other grounds, based on the testimony alone, upon which to rest his adverse credibility determination, and no prejudice would have resulted to Cuko.

Further, the IJ noted that even if Cuko had met his burden of showing he had been persecuted as an active Democratic Party member (and he had not), "the background information does not corroborate his claim that persecution awaits him upon his return to Albania," and therefore, he "cannot establish that he has a well-founded fear of suffering future persecution."  This background information, namely the State Department country reports – which note only minimal political violence and retaliation in present-day, post-Communist Albania - refute the contention that his family would be harmed in the future if they returned to Albania.  This finding is relevant to Cuko's failure to prove a well-founded fear of future persecution.  Even if Cuko had shown he suffered past persecution, which he did not, the IJ's reliance on the State Department reports was sufficient to "rebut[] the presumption of a well-founded fear of future persecution arising from allegations of past persecution based on support for the Democratic Party."  Gjiknuri v. Mukasey, No. 07-1328, 2008 WL 132130, at *3 (1st Cir. Jan. 15, 2008); Alibeaj v. Gonzales, 469 F.3d 188, 192-93 (1st Cir. 2006); Tota v. Gonzales, 457 F.3d 161,

-15-

167 (1st Cir. 2006). The record does not compel a contrary conclusion.

In any event, the adverse credibility determination defeats the petitioner's asylum claim. See Dine v. Gonzales, 464 F.3d 89, 93 (1st Cir. 2006) ("[W]hen a petitioner's case depends on the veracity of . . . testimony, a fully supported adverse credibility determination, without more, can sustain a denial of asylum." (quoting Olujoke v. Gonzales, 411 F.3d 16, 22 (1st Cir. 2005)) (internal quotation marks omitted)). The denial of Cuko's asylum claim also effectively disposes of his withholding of removal claim. See Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004) ("A claim for withholding of deportation demands that the alien carry a more stringent burden of proof than does an asylum claim. Thus, if an alien cannot establish asylum eligibility, his claim for withholding of deportation fails a fortiori.").

In this case, the petitioner's brief does not advance any arguments specific to his CAT claim. To the extent that the claim is not waived, see Dine, 464 F.3d at 93, Cuko's CAT claim was predicated on the veracity of his testimony and the current Albanian political climate, and so this claim, too, fails.

B.        **The Conduct of the Immigration Judge**

Cuko makes a perfunctory argument that the IJ overstepped his authority by assuming the role of a government attorney and engaged in "prosecutorial questioning." The BIA rejected this

position, as we do.  The petitioner's brief points to no specific instance in the record to support this claim.  It is well settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

Regardless, it is clear from the hearing transcripts that the IJ was acting within his broad discretion.  See 8 U.S.C. § 1229a(b)(1) (authorizing the IJ to "receive evidence, interrogate, examine, and cross-examine the alien or witnesses"); Jorgji v. Mukasey, 514 F.3d 53, 59 (1st Cir. 2008).  We agree with the BIA that "the questions and warnings directed to the applicant by the IJ [do not] indicate any pre-disposed bias against the applicant, or [go] beyond the [IJ's] broad discretionary authority to control the pace and scope of the hearing."  Cuko's opportunity to present his case was not restricted.

**III**

**CONCLUSION**

The petition for review is denied.


**-Dissenting Opinion Follows-**

-17-

**CYR, <u>Senior Circuit Judge</u> (dissenting).** Because the majority seriously misreads the appellate record, and particularly the agency's two written decisions, I respectfully dissent. In deferring wholesale to the agency's credibility determinations in these circumstances, the majority turns our review function into a hollow exercise in rubber-stamping.

## I.

In assessing pivotal credibility determinations, we must – at the very least – hold the agency to its word. If the BIA had merely affirmed and adopted the IJ's decision without further elaboration, we would review the IJ's rationales directly and exclusively. Importantly, however, that is not what the BIA's decision purported to do; it added its own gloss. The BIA expressly did not "affirm" – but instead rejected – the IJ's decision that the discrepancies concerning how Cuko smuggled his wife and child into the United States could be weighed in assessing his credibility: "[W]e agree <u>with</u> <u>the</u> <u>applicant</u> that the inconsistencies in the record concerning how much he paid to have his wife and son smuggled into the United States are collateral to his asylum claim." (Emphasis added.) The majority's insistence to the contrary is directly at odds with this plain language.

Further, although the BIA is not required to catalog every basis for affirming an IJ's credibility decision, and indeed could have simply affirmed the IJ's remaining rationales without

comment, the BIA in this case expressly stated that it had found "sufficient other evidence in the record to support the [IJ's] credibility finding." See Sou v. Gonzales, 450 F.3d 1, 7 (1st Cir. 2006) ("In our review, we consider only the reasons stated by the Board for denying relief and do not independently consider whether other grounds would be supported by the record."). If the BIA had proceeded merely to give an example of this "other evidence," one reasonably might argue that it implicitly was affirming all of the IJ's remaining rationales. Rather than begin the next sentence with the phrase "For example," however, the BIA begins with "Specifically," which connotes that it intends to identify the "other evidence" that independently supports its affirmance. See Tobon-Marin v. Mukasey, 512 F.3d 28, 30 (1st Cir. 2008) ("As the BIA adopted and supplemented the IJ's opinion with its own substantive gloss, we evaluate both the IJ's decision and the BIA decisions."); Xue Hong Yang v. United States Dep't of Justice, 426 F.3d 520, 522 (2d Cir. 2005) (noting that when the BIA affirms the IJ's decision in all respects but one, the appellate court must review the IJ's decision as modified by the BIA decision, "minus the single argument for denying relief that was rejected by the BIA"). Given this choice of language, we must ask whether the specific evidence cited as a ground for affirmance – that the party certificate per se contradicts Cuko's testimony that he remained an "active" and "recognized" party member in February and March 2001

-19-

– meets the three-part appellate review standard (<u>viz.</u>, the presence of an actual discrepancy which generates specific reasons to suspect the applicant's veracity, and for which he has provided no persuasive explanation). <u>See</u> <u>Hoxha</u> v. <u>Gonzales</u>, 446 F.3d 210, 214 (1st Cir. 2006); <u>In re A-S</u>, 21 I. & N. 1106, 1109 (BIA 1998).

The majority mistakenly suggests that even this narrower BIA determination is itself a sufficient ground to deny Cuko's petition for review. The putative discrepancy – the Party certificate's necessary implication that Cuko thereafter became "inactive" in his party activities – is simply not a <u>self-evident</u> inconsistency. An asylum applicant might testify, for example, that he entered the country from Canada, then testify later that he entered the country from Mexico. In that case of facial inconsistency (<u>viz.</u>, both versions of the historical facts cannot be simultaneously true), we would be hard-pressed to find that the IJ could not rely on that unexplained inconsistency in finding the applicant not worthy of credence.

By contrast, the Party certificate suggests only that Cuko, a long-time party member, stopped paying his dues in November 2000. When specifically asked to explain why he had stopped paying his dues, he testified that he had planned unsuccessfully to relocate to Tirana to escape increased political persecution. He later testified, however, that he remained "active" in the Party after November 2000, and continued to be "recognized" as an active

party member and organizer. Unlike the black-and-white Canada-Mexico discrepancy hypothesized above, however, the perceived discrepancy between the concepts "non-dues-paying" and "active" is hardly inexorable. See San Kai Kwok v. Gonzales, 455 F.3d 766, 769 (7th Cir. 2006) ("'[A]dverse credibility determinations should not be grounded in . . . easily explained discrepancies' because such bases lack the necessary 'legitimate nexus to the finding.'") (citation omitted); Ming Shi Xue v. BIA, 439 F.3d 111, 114-115 (2d Cir. 2006) ("[W]hen an inconsistency is not self-evident, an IJ may not rely on it to support a credibility determination without first bringing the perceived discrepancy to the alien's attention, thereby giving the alien an opportunity to address and perhaps reconcile the seeming inconsistency, to the IJ's satisfaction, at the least."); accord He Chun Chen v. Ashcroft, 376 F.3d 215, 224 (3d Cir. 2004) ("[A]mbiguous answers at airport interviews should not be relied upon to question the credibility of the alien . . . ."). The adjective "active" obviously requires some further definition and explanation, and in this instance, the IJ did not point out the perceived inconsistency to Cuko at the hearing, nor did he allow Cuko a reasonable opportunity to explain why or how the two items of evidence were not discrepant. Under the first criterion of the Hoxha standard of review, there simply is no actual discrepancy. See, e.g., Bandari v. INS, 227 F.3d 1160, 1167 (9th Cir. 2000) (finding no actual inconsistency between two

-21-

statement that IJ perceived as discrepant).

The certificate proves, at most, that Cuko's <u>official</u> membership in the party terminated when he ceased paying dues in November 2001, as Cuko freely admitted. The IJ neither sought out nor received any evidence, however, that Democratic Party rules forbade persons, whose official party membership had lapsed, from continuing to participate in or to organize party election rallies, and/or that the party actively monitored such participants to ensure that their formal party membership had not expired. Nor was Cuko ever asked to explain the perceived inconsistency. <u>Hoxha</u>, 446 F.3d at 214 (noting that petitioner must have failed to provide a persuasive explanation for the purported discrepancies). During the period from November 2000 to March 2001, Cuko purportedly was planning a move to Tirana, but reasonably may have decided to participate in local party election activities pending that relocation.

More importantly, even if evidence had been presented to the effect that the Party forbade its expired members from taking part in any further party activities and events, Cuko testified that, due to his longstanding and high-profile affiliation with the Democratic Party, most people in town still would "recognize" him as a party member, whether or not his official membership had terminated. Indeed, it is unlikely that the Democratic Party's political opponents – for example, according to Cuko, the police –

would be privy to internal party documentation attesting to the termination of Cuko's official membership. An asylum claim can be predicated not only on an applicant's actual political opinion or affiliation, but on his <u>perceived</u> affiliation with a particular political opinion. <u>See</u> <u>Mekhoukh</u> v. <u>Ashcroft</u>, 358 F.3d 118, 124 (1st Cir. 2004); <u>see</u> <u>also</u> <u>Koudriachova</u> v. <u>Gonzales</u>, 490 F.3d 255, 264 (2d Cir. 2007) ("We explained that the relevant question is not whether an asylum applicant subjectively holds a particular political view, but instead whether the authorities in the applicant's home country <u>perceive</u> him to hold a political opinion and would persecute him on that basis."); <u>Chun Gao</u> v. <u>Gonzales</u>, 424 F.3d 122, 129 (2d Cir. 2005) ("'[A]n imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the Immigration and Nationality Act.'")(quoting <u>Alvarez-Flores</u> v. <u>INS</u>, 909 F.2d 1, 4 (1st Cir. 1990)).

By denying Cuko's petition for review on this basis, the majority essentially condones and rubber-stamps an undesirable policy and practice: an IJ silently may collect what he perceives as testimonial discrepancies of a latent kind which would not be readily apparent to the asylum applicant or his counsel, offer the applicant no contemporaneous opportunity to explain why his perception is faulty, and then blindside the applicant after the fact with an asylum decision premised entirely on his untested

-23-

adverse credibility findings.  This practice is not only at odds with our clear precedent, but would subvert the essential truth-seeking function of asylum proceedings.

**II.**

Even if my interpretation of the BIA decision were arguable, and we were permitted to review the IJ's other rationales for the adverse credibility determination, the other discrepancies identified by the IJ are not objectively supportable grounds for his adverse credibility finding.

## A.   Cuko's Chain of Custody Testimony

With respect to the alleged discrepancy in Cuko's accounts as to how he obtained his Democratic Party membership card as a hearing exhibit, the inconsistency in his accounts is self-evident, and the IJ afforded Cuko adequate opportunity to explain them.

That said, the BIA's refusal to mention the IJ's chain-of-custody rationale as a ground for its affirmance is not surprising.  When an IJ bases an adverse credibility determination on alleged testimonial discrepancies, he or she must be especially "'sensitive to the complexities of receiving testimony through a translator,'" and the possibility "that the alleged discrepancy resulted from confusion, and not an attempt at fabrication." Heng v. Gonzales, 493 F.3d 46, 49 (1st Cir. 2007) (citing Giday v. Gonzales, 434 F.3d 543, 549 n.2 (7th Cir. 2006)).  When the IJ

asked Cuko to explain why he first testified that his father-in-law had obtained the membership card from the party archives after Cuko arrived in the United States, Cuko stated that he had been "confused," since other documents comprising Exhibit 5 were so obtained, but then he had recalled that it was not necessary for his father-in-law to get the card from the archives because Cuko already had the card in his possession before he left Albania.

A close review of the record amply supports the plausibility of Cuko's explanation. The crux of this inquiry was whether Cuko was a Democratic Party supporter, and the fact that the Party issued this card would tend to prove that fact. The particulars of whether Cuko's father-in-law retrieved the card directly from the Party archives, from Cuko's home, or from Cuko himself, are not particularly important to that core inquiry. Moreover, even the attorneys experienced considerable confusion over this line of questioning, and expressed doubts whether Cuko had even been shown the <u>correct</u> hearing exhibits during his previous testimony. Rather than take steps to insure that Cuko's explanation was not bona fide, however, the IJ simply forged ahead. If even attorneys proficient in English were so befuddled, we can hardly have great confidence that Cuko was not. <u>Id.</u>

## B. Party Certificate

Tellingly, the BIA affirmed solely on the IJ's rationale that the Party certificate's declaration that Cuko stopped paying

party dues in November 2000 was inconsistent with his testimony that he remained "active" in party activities thereafter. Its silence as to the IJ's two other sub-rationales based on the Party certificate speaks volumes. The Cuko explanation for stopping his payment of dues – that he unsuccessfully contemplated a relocation to Tirana to avoid increased political persecution during the upcoming election season – is not inherently implausible. The record also contains no affirmative evidence tending to show Cuko's explanation was a mere fabrication.

By the same token, the IJ's assertion that one reasonably should expect that this type of Party certificate would contain a detailed narrative of Cuko's history with the Party, and especially of the specific acts of political persecution allegedly inflicted on him in early 2001, is rank speculation. The terse certificate purported only to be a ministerial verification of Cuko's official enrollment dates in the party. It indicated that it was issued at Cuko's request (viz., to verify that he was affiliated with the Party), which means that it likely would confine its subject matter to the specific and narrow question that Cuko's application posed. Again, the record contains no evidence that these certificates typically would contain an exhaustive or individualized history of the applicant's activities with the party. Accordingly, the BIA made nary a mention of these dubious IJ findings.

## C. Other Concerns

Cuko aptly notes that the IJ also purported to base his adverse credibility decision, in part, on "material inconsistencies and discrepancies between the applicant's <u>written asylum application</u> and his testimony," but then failed in the remainder of his decision to cite any specific examples of such variances. Instead, the IJ based his entire credibility decision on the three core discrepancies discussed above, and the BIA relied on only one inconsistency. To the extent that the Cuko asylum application suggests that he remained active in Democratic Party causes and activities after the formal termination of his party membership in November 2000, however, that allegation is coterminous with the substance of his hearing testimony in this regard, and is not at "variance" with his asylum application.

If that were all the IJ meant by his reference to "discrepancies between the applicant's written asylum application and his testimony," it would seem that no prejudice would result to Cuko. Yet we are left with no reliable guidance as to whether the IJ relied on other purported "variances" which are neither disclosed nor described in his decision. This unilluminated reference inevitably undercuts overall confidence in the reliability of the IJ's credibility determination.

## D. Fear of Future Persecution

Although the majority correctly concludes that the

country reports might have supported the IJ's independent decision anent Cuko's lack of a well-founded fear of future persecution, the IJ did not rely solely on these reports. Rather, he explicitly states: "Even if this court were to take other sections of the State Department report and responses in this record of proceedings to contradict that Profile, this Court must note that the applicant has been found to be not a credible witness, and therefore, this Court cannot find that his testimony or the documents that he has submitted are credible." Because the IJ's defective credibility determination fatally infected his decision concerning the issue of future persecution, we cannot affirm on that independent ground.

### III.

Finally, from a broader policy perspective, I would suggest that this case is a prime example of what is so defective with many immigration proceedings. While the IJ reasonably might have accepted Cuko's credibility arguendo, and then denied his asylum application either on the ground that his ill treatment did not rise to the level of "persecution," or that the country reports refuted his fear of any future persecution (indeed, we have affirmed many IJ opinions to the effect that country conditions in Albania have changed significantly), the IJ deliberately chose silently to collect a catalog of perceived testimonial discrepancies during the hearing, and then base his final decision solely on Cuko's lack of credibility. This may seem a relatively

insignificant and academic distinction, but to an asylum applicant, it likely affects his sense that he has been given a <u>fair</u> opportunity to state his case for asylum. He is removed to his home country simply because he is a liar, and not because he has not proven past persecution or a well-founded fear of future persecution. Whether or not we agree about the specific facts of the present case, I think it is incumbent on us to demand from the agency a minimum threshold of fairness in the <u>process</u>. Expecting that the IJ will afford an applicant a fair chance contemporaneously to explain perceived discrepancies upon which the IJ intends to base his adverse credibility determination is just such a <u>de</u> <u>minimis</u> requirement. <u>Zi Lin Chen</u> v. <u>Ashcroft</u>, 362 F.3d 611, 618 (9th Cir. 2004). Short of that, our review function becomes essentially meaningless.