# United States Court of Appeals
## For the First Circuit

No. 08-2398

RU XIU CHEN; XIU JIN ZHENG,

Petitioners,

v.

ERIC H. HOLDER, JR.,[*] ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

William P. Joyce and Joyce & Associates P.C. on brief for petitioners.
Carmel A. Morgan, Trial Attorney, Office of Immigration Litigation, Michael F. Hertz, Acting Assistant Attorney General, Civil Division, and Barry J. Pettinato, Assistant Director, on brief for respondent.

August 27, 2009

---

[*]     Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Eric H. Holder, Jr., has been substituted for former Attorney General Michael B. Mukasey as the respondent.

**LYNCH**, **Chief Judge**.  Ru Xiu Chen and his wife Xiu Jin Zheng, both natives and citizens of China, petition for review of a final order by the Board of Immigration Appeals ("BIA"), denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  The BIA affirmed the decision of an Immigration Judge ("IJ"), who denied their applications on the basis of an adverse credibility finding. We deny their petition.

## I.

We briefly summarize petitioners' testimony before an IJ. Chen and Zheng were married on August 5, 1989.  Zheng soon became pregnant with her first child and gave birth to a son on May 1, 1990.

Zheng then became pregnant again, in violation of China's policy of allowing only one child per couple.  On May 18, 1991, when Zheng was eight months pregnant, government officials learned of her second pregnancy and came to her mother-in-law's house, where she and Chen were living, to force her to have an abortion. Chen and Zheng protested, and seven or eight government officials forcibly removed Zheng from the home.  Zheng was taken to a hospital, where she received an injection directly below her bellybutton.  Seven or eight hours later, Zheng felt intense pain; about ten hours later, Zheng gave birth to a stillborn baby.  Chen

had followed Zheng to the hospital, and Zheng later saw Chen at the hospital.

Shortly thereafter, Zheng became pregnant for a third time. She went into hiding and secretly gave birth to a daughter on April 16, 1992. During her pregnancy, Zheng received medical care from a "private" doctor in China. Zheng provided no medical records to document the care that she had received from this doctor.

Government officials learned of Zheng's second birth and came to the home of Zheng's mother-in-law in June 1992, looking to sterilize Chen and Zheng. Zheng testified that family planning authorities had come to her mother-in-law's home a total of three times. The first time was the incident in 1991 when family planning officials forced Zheng to have an abortion. The second time was the June 1992 incident. According to Zheng, the most recent time that family planning authorities visited her mother-in-law's home was in 1999 when they came to collect a fine for having more than one child per couple. Zheng also described a fourth incident in which the family planning officials had visited her mother-in-law's home in 1994 to collect the overbirth fine. Zheng's mother-in-law submitted a letter, which described only the 1992 incident.

After the June 1992 incident, Chen chose to leave China, and Zheng moved away from her mother-in-law's house. Zheng lived

with a family friend from July 1992 until October 1992. She then lived with her younger brother, where she stayed for more than two years, beginning in October 1992. Zheng took her newborn daughter with her but left her son to live with her mother-in-law.

A friend helped Chen leave China. Initially using a Chinese passport in his own name, Chen traveled through Hong Kong, Bolivia, and Peru before arriving in the United States on July 27, 1992. He presented a fraudulent Japanese passport, and U.S. immigration officials denied him admission to the United States. Chen applied for asylum, withholding of removal, and protection under the CAT on January 25, 1993. His application alleged that Chinese officials had forced his wife to have an abortion during the eighth month of her pregnancy. Chen also claimed that if he were returned to China, he would be forcibly sterilized for violating China's policy of allowing one child per couple.

About one-and-a-half years later, Zheng, who was still living in hiding at her brother's home in China, told Chen that his father in China was dying of liver cancer. Chen chose to return to China to visit his father and applied for advanced parole from U.S. immigration officials. The agency granted Chen advanced parole on June 24, 1994. Chen obtained a passport in his own name from U.S. immigration officials, and he traveled to China under his own name for approximately two weeks, returning to the United States on August 4, 1994. The ease with which Chen was able to return to

China conflicts with his statement in the affidavit he filed in support of his asylum application that he had been "smuggled" out of China and had been "blacklisted" by the family planning authorities.

When Chen returned to China, he stayed with Zheng for five days in a hotel under his own name near the hospital where his father was receiving treatment. Family planning officials were "hiding in the entrance of the hospital, try[ing] to catch [him]." Chen's mother warned him that the family planning officials were at the hospital, and Chen left the area and stayed in the town where his wife had been hiding for several days. Family planning officials never came to Chen's hotel looking for him and did not pursue him further during the time he remained in China.

Zheng joined her husband in the United States approximately a year later, entering the country without inspection on July 20, 1995. Before coming to the United States, Zheng left her two children with her mother-in-law in China. On April 26, 1996, Chen filed a second asylum application, listing his wife as a derivative beneficiary. Chen attached to his second asylum application the same affidavit describing his experiences in China that he had used for his original asylum application in 1993. He did not mention the 1994 incident in which family planning officials were allegedly hiding at the hospital where Chen's father was receiving treatment.

The agency referred Chen's asylum application to an IJ on April 15, 2004 and simultaneously issued Zheng a Notice to Appear ("NTA"), charging her with removability under 8 U.S.C. § 1158(a)(6)(A)(i). On December 22, 2004, Zheng appeared before an IJ, admitted the facts contained in the NTA, and conceded removability.

On February 22, 2005, Zheng filed a separate asylum application, listing Chen as a derivative beneficiary. Zheng's application claimed that Chinese officials had forced her to have an abortion when she was eight months pregnant in 1991. She also alleged that government officials came looking for her husband following the birth of their second child in 1992 and wanted to sterilize him for violating China's one-child policy.

Petitioners' applications subsequently were joined for hearing purposes but were not consolidated. Zheng and Chen testified before an IJ at a hearing on September 6, 2005. At the close of the testimony, the IJ noted that she was "a little troubled by the changing testimony . . . and . . . at [Zheng's] hesitancy in answering some of the questions that were put to her." At the hearing, Zheng testified that she had a miscarriage in 2004 while she was living in the United States. Zheng presented no medical records to corroborate this claim, and her lawyer had only learned of the miscarriage from Zheng as they were talking on the way to the hearing that morning. Although Zheng had been seeing a

-6-

gynecologist annually since living in the United States and claimed that she was still suffering side effects, such as dizziness, from her 1991 forced abortion, she did not mention the 1991 abortion to her gynecologist until she suffered the miscarriage in 2004.

The IJ offered Zheng and Chen an opportunity to obtain evidence corroborating their claim, including medical records. She also invited petitioners to have Chen's brother and Zheng's sister, both of whom lived nearby in Massachusetts, testify and continued the proceedings to allow them to secure those witnesses. Chen's brother never testified before the IJ.

The IJ held a further hearing on November 4, 2005. At that hearing, the IJ asked Zheng questions about the medical records from her doctor in the United States that she had submitted. The IJ said that "[Zheng's] demeanor . . . was very strange indeed" when she testified and suggested that having the doctor that Zheng had been seeing in the United States testify would help corroborate her testimony and clarify the meaning of some of the notations in her medical record. The IJ continued the proceedings to allow Zheng's doctor and Zheng's sister to appear as witnesses. The parties agreed to resume the hearing on December 7, 2005.

Zheng's doctor, however, was unavailable to testify, and the hearing resumed on July 18, 2006. At that time, the IJ heard testimony from Zheng's sister, who stated that Zheng first told her

about the forced abortion two years after it had allegedly occurred. Zheng's sister testified that Zheng had chosen not to tell her about the abortion for two years because she has heart problems and Zheng did not want to cause her stress.

The hearing was continued several times to allow Zheng's doctor to testify. But Zheng's doctor ultimately never testified.

The IJ issued a written decision on May 30, 2007, which found certain aspects of petitioners' testimony not credible and denied them relief on that basis. In particular, the IJ held that "[petitioners] have failed to present credible, consistent, and detailed testimony to demonstrate that Chinese government officials persecuted them by forcing [Zheng] to undergo an abortion in 1991 or by pursuing [Chen] for sterilization."

The IJ identified three significant problems with Chen's testimony: (1) his apparently shifting stories as to his motive for leaving China; (2) his testimony that Zheng continued to live at home with his mother after he had left China in 1992, which conflicted with Zheng's testimony that she went into hiding during that period; and (3) his testimony that family planning authorities were hiding in the hospital where Chen's father was receiving treatment when Chen returned briefly to China in 1994 but chose not to pursue Chen at his nearby hotel where he was staying under his own name. Likewise, the IJ found that Zheng's testimony was not credible because (1) she had not listed the addresses where she had

stayed for more than two years while she was allegedly hiding following Chen's departure from China in 1992, (2) she was inconsistent in describing the number of times that family planning authorities had visited her home in China, and (3) she provided no corroborating medical records for the medical treatment she received during her most recent pregnancy in China. The IJ found that these inconsistencies went to the heart of petitioners' claims.

In separate opinions issued October 10, 2008, the BIA adopted the IJ's adverse credibility findings and affirmed the IJ's decision on that basis. Zheng and Chen timely petitioned for review.

II.

"Where, as here, 'the BIA adopted and affirmed the IJ's ruling, but also discussed some of the bases for the IJ's opinion, we review both the IJ's and the BIA's opinion.'" Mam v. Holder, 566 F.3d 280, 282 (1st Cir. 2009) (quoting Cuko v. Mukasey, 522 F.3d 32, 37 (1st Cir. 2008)). We review the agency's adverse credibility determination under the deferential substantial evidence standard. Id. at 283. "[W]e will not upset the agency's credibility determination unless petitioners can show the record evidence, considered as a whole, 'would compel a reasonable factfinder to make a contrary determination.'" Id. (emphasis in original) (quoting Cuko, 522 F.3d at 37).

-9-

Our assessment of an adverse credibility determination focuses on whether "(1) 'the discrepancies articulated by the IJ and/or the BIA are actually present in the administrative record'; (2) 'the discrepancies generate specific and cogent reasons from which to infer that petitioner or his witness provided non-creditworthy testimony'; and (3) 'petitioner failed to provide a persuasive explanation for these discrepancies.'" Id. (quoting Cuko, 522 F.3d at 37). Because petitioners filed their asylum applications before the effective date for the REAL ID Act, we apply the "heart of the matter rule," which requires that "discrepancies relied upon by the trier in making adverse credibility determinations must 'pertain to facts central to the merits of the alien['s] claims, not merely to peripheral or trivial matters.'" Bebri v. Mukasey, 545 F.3d 47, 50 & n.1 (1st Cir. 2008) (quoting Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006)).

We start by limiting the areas of disagreement with the IJ's decision that we will consider. The government candidly concedes that several of the discrepancies highlighted by the IJ are not supported by the record. These discrepancies include (1) a perceived inconsistency in Chen's description of his motive for leaving China and (2) a possible conflict between Chen's and Zheng's accounts of Zheng's whereabouts after Chen's departure from China. We agree with the government that these alleged discrepancies are not supported by the record, and they form no

-10-

part in our analysis. Nonetheless, there were still so many inconsistencies in petitioners' testimony that we find the IJ's adverse credibility determination was supported by substantial evidence. Petitioners' failure to present corroborating evidence that could have resolved some of the inconsistencies in their testimony is especially troubling because the IJ gave petitioners numerous opportunities to obtain corroborating evidence to address what she had identified as weaknesses in their story and continued the proceedings for more than a year to permit petitioners to gather corroborating evidence.

We find the IJ's adverse credibility determination supported by substantial evidence. Notably, Zheng inconsistently described her whereabouts during the period following Chen's departure. This discrepancy, which involves Zheng's response to a perceived threat from Chinese family planning authorities spanning more than a two-year period, goes to the heart of petitioners' claims. In her testimony before the IJ and in her affidavit in support of her asylum application, Zheng stated that she went into hiding after Chen left China in 1992, staying at a friend's house for several months before living with her younger brother for more than two years. In her asylum application, however, she listed only a single address in China, which was neither her friend's address nor her brother's. Zheng provided no satisfactory explanation for why she neglected to include the addresses of her

-11-

friend and younger brother in her asylum application. And she did not offer easily obtainable corroborating evidence, such as a letter from her brother to confirm that she had lived with him for more than two years.

Beyond that, substantial evidence supports the IJ's finding that Zheng testified inconsistently about the number of times that family planning officials had visited her mother-in-law's house. When asked directly how many times family planning officials had visited the house, Zheng stated that they had come three times. She then described a total of four visits made by family planning officials. The letter from Zheng's mother-in-law described only one such visit, and Zheng could not explain why the mother-in-law's letter did not mention at least two of the other visits. This inconsistency goes to the heart of petitioners' claims because it is relevant to the intensity of the threat posed by their alleged persecutors.

Additionally, Zheng's delayed reporting of the 1991 forced abortion to her sister and doctor in the United States casts doubt on the credibility of her account. It is suspicious that Zheng waited two years to disclose to her sister what her sister described as "a big incident for her." And Zheng would have had no reason to wait years before disclosing the 1991 abortion to her doctor in the United States, especially when she was still suffering dizziness as a side effect of the procedure.

-12-

Likewise, substantial evidence supports the IJ's determination that Chen's account of his brush with the family planning authorities at the hospital where his father was staying in 1994 was inherently implausible. According to Chen, family planning officials were "hiding in the entrance of the hospital, try[ing] to catch [him]." Chen said that he avoided the family planning officials only because his mother had warned him of their presence. Yet Chen failed to include this incident in his subsequent asylum application. And it is difficult to believe that family planning officials would hide at the hospital to catch Chen but would not take the further step of seeking him out at his nearby hotel, where he was staying in his own name. Moreover, the fact that Chen returned to China using a passport issued in his own name conflicts with his account that he had been "blacklisted" by the authorities, and his willingness to return voluntarily suggests that his fear of persecution was not well-founded. Therefore, the IJ could properly disbelieve Chen's story about the family planning officials at the hospital in 1994 and base an adverse credibility finding on it.

Finally, the IJ's adverse credibility determination was based, in part, on witness demeanor. "Since the IJ has the best vantage point from which to assess the witnesses' testimonies and demeanors, we accord significant respect to these witness credibility determinations." Mam, 566 F.3d at 283 (quoting Cuko,

-13-

522 F.3d at 37) (internal quotation marks omitted). At various points throughout the hearing, the IJ noted that Zheng's demeanor made her skeptical of Zheng's credibility and offered Zheng multiple opportunities to supplement the record with further documentation and witnesses in support of her claim. Zheng failed to provide the IJ with the corroborating evidence that she had requested.

Because Chen and Zheng failed to provide credible testimony, they could not meet their burden of proof to establish their asylum claims or the more stringent burden for withholding of removal. See Mam, 566 F.3d at 285-86. Likewise, they cannot meet their burden for relief under the CAT because their claims are based on the same deficient testimony. See Khan v. Mukasey, 541 F.3d 55, 58 (1st Cir. 2008).

## III.

The petition for review is denied.