LYNCH, Chief Judge.
Alphonse Dehonzai, of the Ivory Coast, petitions for review of a July 10, 2009 order by the Board of Immigration Appeals (BIA). The BIA, affirming an October 4, 2007 ruling of an Immigration Judge (IJ), denied Dehonzai’s application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), finding he had not met his burden under any of those claims. Dehonzai argues that the BIA erred in finding he had not met his burden because there was error in the IJ’s adverse credibility determination. We deny the petition. The record does not compel a reasonable factfinder to reach an opposite conclusion as to Dehonzai’s failure to meet his burden or as to his credibility. See 8 U.S.C. § 1252(b)(4)(B).
I.
Dehonzai entered the United States without authorization on July 25, 2000 from the Ivory Coast. He left his wife, Cecile, their three children, his mother, and three of his siblings there. In 2001, he applied for asylum, withholding of removal, and protection under the CAT on the basis of political persecution. His application was denied, and he was deemed eligible for removal and issued a notice to appear on February 22, 2002. Dehonzai conceded removability but sought leave to seek asylum, protection under the CAT, and withholding of removal.
Dehonzai’s refugee claims are predicated upon two separate incidents of arrest and detention in the Ivory Coast in 1992 and 2000. He described those incidents and relevant background facts to immigration officials on three occasions: (1) within his 1-589 asylum application, filed in 2001,[1] (2) within an affidavit executed on November 5, 2004 and submitted to the IJ in 2006, and (3) during testimony at a March 10, 2006 hearing before the IJ, one of four *3 hearings held before the IJ.[2] We describe the facts as set forth within Dehonzai’s statements.
Dehonzai was born in the Ivory Coast in 1969. In 1988, he graduated from a vocational school that specialized in accounting. After his graduation, he began working as an accountant at Cocody Medical Center, where he was employed until April 2000.
While a student in 1985, Dehonzai joined the Fédération Estudiantine et Scolaire de Cote D’Ivoire (FESCI), a political organization comprised mainly of Ivorian students. Dehonzai also became involved with the Rassemblement des Républicans (RDR), an opposition political movement led by Alassane D. Ouattara. Dehonzai served as an advisor at the RDR’s youth branch in Cocody from 1991 until May 2000.
On February 18, 1992, Dehonzai and other members of both FESCI and RDR participated in a peaceful march of protest against the Ivorian government, primarily seeking the reinstatement of free higher education. Following the march, Dehonzai and several other members of FESCI and RDR were arrested. Dehonzai was held in the Cocody police station for three days. During his 2006 testimony, he stated for the first time that the police kicked him, hit him with wires, and made him do pushups during his 1992 detention. During his 2006 testimony he also stated for the first time that, following his release in 1992, the police threatened to kill him if he continued to oppose the government.
By his own account, Dehonzai did not have another encounter with government officials after 1992 until 2000. In the spring of that year, military personnel arrested the journalist Joules Toualy, whom Dehonzai claimed was his cousin.[3] Dehonzai asserted that two soldiers in plain clothes arrested Toualy at the offices of “Le Jeune Democrate,” the newspaper at which Toualy was employed. Toualy was apparently arrested for having written an article regarding military mutiny.
On April 12, 2000, Dehonzai criticized the government’s treatment of Toualy to at least twelve of his colleagues at the Cocody Medical Center while they were dining in the employee cafeteria. Dehonzai posited, but offered no proof, that one of those colleagues was aware that Toualy was Dehonzai’s cousin and reported him to the Republican Guard — described by Dehonzai as the “local FBI” — sometime thereafter. Dehonzai said he was fired from his job at Cocody Medical Center on April 15, 2000, three days after criticizing Toualy’s arrest.
Dehonzai first mentioned his firing at the March 10, 2006 hearing. When asked why he was fired, he replied, “Well, first of all, I went to jail and when I got out of jail, I started working. And after that when the new boss came in and he was a member of the government. And when I start *4 ed working, they had arrested my cousin.” He also testified that in firing him, his new boss told him that he was “not here to do politics” and that Toualy’s arrest and treatment were “none of this office’s business.” Dehonzai provided no further information regarding the relationship between his termination and his criticism of Toualy or his subsequent arrest.[4]
Dehonzai testified that on May 29, 2000, two soldiers of the Republican Guard entered his house, arrested him, and transported him to the Akwedo military camp where he was placed in a small cell. Dehonzai claims his arrest and detention occurred as a direct result of the statements criticizing Toualy’s arrest that he made six weeks prior. Other than his own testimony there is no evidence that he was arrested, detained or persecuted in 2000.
Dehonzai maintains that he was detained for two days,[5] during which he was subjected to various forms of mistreatment, including being beaten, kicked, and flogged with wires. In his asylum application and his affidavit, Dehonzai gave a vivid description of his mistreatment following his arrest. He stated: “They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back.”
This description virtually copies Toualy’s description of his own arrest and detention. Toualy’s description was published in a September 19, 2000 Amnesty International report submitted by Dehonzai in support of his refugee claims: “They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back.”
When questioned as to why his description of his mistreatment in 2000 was nearly identical to the description used by Toualy within the Amnesty International Report, Dehonzai did not directly answer. He said, rather, “I apologize.” He went on to say, “In Africa when they’ve sent you to the police station, and when they beat you, they do, that’s what the police does. You have to, they kick you. You have to be strong. And you have to crawl in water.” This last assertion regarding crawling in water was one he had not given before.
Upon his release from the Akwedo military camp in 2000, Dehonzai says he was told by police that “next time, we’re going to kill you for good.” Fearful of returning to his own home, Dehonzai testified he stayed at the home of his cousin, Jean Baptiste. While there, Dehonzai says he learned through word of mouth that military personnel had gone to his home and inquired as to his whereabouts. Frightened by the news of their visit, Dehonzai procured another person’s passport with the help of Jean Baptiste and fled the Ivory Coast without his wife or three children, whom he believes are still in the Ivory Coast but with whom he now has no contact. Dehonzai also left his mother and three of his siblings behind in the Ivory Coast. At no time has Dehonzai asserted that any of his relatives were ever subject to persecution by the Ivory Coast government while there.
Dehonzai traveled directly from the Ivory Coast to the United States, arriving in New York’s John F. Kennedy Airport on July 25, 2000.
*5 At the March 10, 2006 hearing, Dehonzai was specifically asked to clarify certain elements of this factual account, and was often asked to do so repeatedly in light of the IJ’s view that he was evasive in answering questions. He was asked several times to provide information regarding the passport he used to enter the United States, including the name that was used on the document. Dehonzai refused to provide any information, stating “when my cousin got me this document, he had me swear because if I give the name, they’re going to kill my family.” Later, at an April 6, 2007 hearing, Dehonzai did submit the name used on the passport.
When asked to provide support for his claim that Joules Toualy was his cousin, Dehonzai submitted a letter allegedly from Toualy — written by hand, in French, and dated April 12, 2004 — which states:
Good morning cousin Alphonse,
Life difficulties contribute to the formation of a human being. I believe you know that. Here the situation remains critique specially in the political plan. The assault to the residences, murder, and denunciation do happen frequently. Probably if you were there you would be dead or disappeared like the others. The case of your handsome Toh Laurent since 2003 it is palpable. Even the pianist Marcelin Yace and the comedian H would be killed by the unknown. It is how the fear is here. In hiding, at moment, I wrote this letter, I have no news about your children.
I stop here.
God be with you and regards to yours. Yours,
Jules Toualy
There was no corroborating evidence the letter was in fact from Toualy or that Toualy was in fact Dehonzai’s cousin. Although he was asked at the March 2006 hearing to provide additional support for his claim that Toualy was his cousin before his next hearing in April 2007, Dehonzai did not do so. Eventually, in a June 2007 submission to the IJ, he provided documents which he said were his and Toualy’s birth certificates.
The IJ repeatedly informed Dehonzai and his attorney that Dehonzai’s credibility was at issue. The IJ specifically noted Dehonzai’s failure to provide information as to the passport he used to enter the United States. The IJ observed that because no information regarding the passport was submitted and there was no other corroborating evidence regarding Dehonzai’s entry date, “[i]t’s going to be a tough call for me to say that [he] met his burden of proof on timeliness, particularly when the respondent declines, when asked, to provide that information, the very information that could corroborate or not.” This was pertinent to the requirement that asylum applications be filed within one year of the applicant’s date of entry. See 8 U.S.C. § 1158(a)(2)(B). The IJ also noted the lack of corroborating evidence regarding Dehonzai’s relationship with Toualy.
The March 10, 2006 hearing was continued to April 6, 2007, partially to give Dehonzai more time to prove his claims, particularly in light of the IJ’s questions about credibility. When Dehonzai’s attorney inquired as to the scope of additional evidence he should provide in advance of the April 2007 hearing, the IJ responded, “what you have to do is anything that occurs to you based on the hearing we’ve had up until now, that would corroborate your client’s testimony. He doesn’t have a lot of corroboration. That doesn’t mean it’s not true. But I’m just short of good pre-cross-examination. So, nota bene.”
Despite these warnings, Dehonzai’s *6 counsel[6] provided little in the way of corroborating evidence before or at the April 6, 2007 hearing. Dehonzai failed to produce the passport that he used to enter the United States, and instead only revealed that “Alphonse Bah” was the name on the passport. The only other evidence he offered at the April 6, 2007 hearing — besides additional reports on country conditions in the Ivory Coast — was a paper labeled “certificate of individual investigation,” a document purportedly procured from the Ivory Coast government, though no government entity is identified in it, which states that Dehonzai was under investigation for his political activities. During the hearing, the IJ stated that the paper was “highly unlikely to be real” as he could not “imagine any kind of an organization that does investigatory work for the government to certify that somebody is under investigation for political activities.” The IJ again stated on the record that “there were some problems for the respondent,” including that there is an “eery similarity” between Dehonzai’s description of his treatment in detention and Toualy’s description of his own treatment.
The IJ once again delayed issuing his decision and continued proceedings so that Dehonzai might further corroborate his testimony. In June 2007 Dehonzai submitted copies of allegedly official birth certificates for himself and Toualy. No other corroborating evidence was ever provided.
The IJ issued his decision in an October 4, 2007 oral ruling. First, the IJ observed that Dehonzai stated his date of entry into the United States was July 25, 2000, and that although his 1-589 was date-stamped July 27, 2001, Dehonzai had signed the form on May 30, 2001. In light of these facts, the IJ stated he was “inclined to give the respondent the benefit of the doubt as to a good faith effort to make a timely filing,” and deemed Dehonzai’s asylum application timely under 8 U.S.C. § 1158(a)(2)(B).
The IJ next turned to the issue of Dehonzai’s credibility, finding him not credible and articulating a number of specific grounds for the adverse credibility determination. For purposes of judicial review, we set forth three: (1) the language in Dehonzai’s asylum application and affidavit about his own detention and mistreatment that virtually copies Toualy’s description in the September 19, 2000 Amnesty International Report submitted by Dehonzai, and the IJ’s view that Dehonzai’s response was inadequate as to why the replication existed; (2) the IJ’s assessment of the implausibility of Dehonzai’s assertions, specifically the unlikelihood that he would be arrested a full six weeks after he claimed to have criticized Toualy’s arrest in a work setting, which Dehonzai said was the triggering event for his own 2000 arrest; and (3) the IJ’s evaluation, after observing Dehonzai and listening to his testimony, that Dehonzai was evasive, avoided answering questions, and was unable to provide detailed testimony at the March 10, 2006 hearing. In addition, the IJ noted Dehonzai’s failure to provide corroborating evidence to support his claims, despite having been requested to do so.
The IJ rejected Dehonzai’s asylum claim on the basis of the adverse credibility finding. Having rejected Dehonzai’s asylum claim, the IJ determined he was not entitled to withholding of removal or protection under the CAT.
*7 Dehonzai appealed to the BIA, primarily challenging the IJ’s credibility determination. The BIA denied the appeal. It found no error in the IJ’s adverse credibility determination, holding that the IJ articulated specific “discrepancies in the respondent’s testimony which are present in the administrative record and go to the heart of his claim, implausibilities in the respondent’s account of events and chronology, use of nearly identical language as that used in an Amnesty International report to describe his own experience, and evasive demeanor.” With regard to the specific inconsistencies between Dehonzai’s 2001 asylum application and Dehonzai’s other representations to immigration officials, the BIA rejected Dehonzai’s explanation that those inconsistencies resulted from the fact that he was aided by a non-lawyer who did not speak his particular dialect of French, and who allegedly put down false information on Dehonzai’s asylum application. The BIA noted both that Dehonzai was represented by counsel from 2003, and that “the respondent swore to the veracity of the information in his application and at no point prior to the merits hearing or in his direct presentation of evidence [in 2006] did he recant any of the information in his 2001 application as inaccurate.” The BIA also found that Dehonzai had offered no explanation “as to why the non-lawyer [who assisted with Dehonzai’s 1-589 asylum application] would have changed the substance of the information that the respondent had given him to reflect different dates, periods of detention, or other details than the respondent provided.” The BIA observed that “the only letter he submitted in an attempt to corroborate the substance of his claim of being a refugee did not address the factual circumstances of his claim,” and found he failed to meet his burden of proof.
II.
Dehonzai petitions for review, arguing that the BIA erred in finding no error in the IJ’s adverse credibility determination.
We review factual findings, including credibility determinations, under the familiar substantial evidence standard. Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir.2009). Credibility determinations and other “administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B); see also Cuko v. Mukasey, 522 F.3d 32, 37 (1st Cir.2008). “Merely identifying alternative findings that could be supported by substantial evidence is insufficient to supplant the [IJ’s and BIA’s] findings.” Albathani v. INS, 318 F.3d 365, 372 (1st Cir.2003).
Ordinarily, we review the decision of the BIA, but we also “review those portions of the IJ’s opinion that the BIA has adopted.” See Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir.2004); see also Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir.2004) (“[W]hen the BIA both adopts the findings of the IJ and discusses some of the bases for the IJ’s decision, we have authority to review the decisions of both the IJ and the BIA.”).[7]
*8 There is no doubt the inconsistencies identified by the IJ and the BIA appear in the record. Dehonzai argues, rather, that in rendering its credibility determination, the IJ “harped upon minor inconsistencies” and ignored the “ample amount of evidence” that he submitted to support his claims. That some of the discrepancies relied upon were more significant than others does not undercut the conclusion of the BIA and IJ. The BIA and IJ decisions are supported by substantial evidence on key points. A reasonable fact-finder could find that Dehonzai’s description of his mistreatment in the same words as Toualy was not creditworthy, that no other evidence supported Dehonzai’s claims, and that the inconsistencies in Dehonzai’s testimony were not adequately explained. A reasonable factfinder could also conclude that Dehonzai failed to provide adequate supporting material to substantiate his claim after he was explicitly warned that his credibility was in question.
The BIA and IJ found it particularly troubling that the language Dehonzai used within his asylum application and affidavit to describe his mistreatment in 2000 was virtually identical to the language attributed to Toualy within the Amnesty International report. The IJ reasonably concluded this “suggests ... that the respondent has adopted the Toualy story for his own purposes.” Dehonzai argues that the similarity in language was “mere coincidence.” But the replication was severe, and neither the IJ nor the BIA was required to view this as “mere coincidence.” Dehonzai wrote in 2001 and 2004: “They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back.” Toualy’s description, as published in the 2000 Amnesty International report, was: “They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back.” The BIA and IJ’s conclusions were reasonable and supported.
Moreover, on two different occasions Dehonzai was asked and “afforded ‘a reasonable opportunity to explain’ ” why, in both his 2001 asylum application and his 2004 affidavit, he had used language that so closely replicated the language Toualy used to describe his own experiences. Cuko, 522 F.3d at 39 (quoting Zi Lin Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir. 2004)). It was reasonable for the BIA and IJ to conclude the explanations offered were inadequate. Upon being asked at the March 10, 2006 hearing why the language within his asylum application and affidavit virtually copied Toualy’s description, Dehonzai did not assert his description was accurate. At the April 6, 2007 hearing, the IJ once again noted the “eery similarity” between Dehonzai’s statements and Toualy’s first-person account, but Dehonzai again failed to offer any explanation as to why that near identieality existed.
The BIA and IJ also found it implausible that Dehonzai was arrested, as he posited, as a result of his complaints to co-workers at work about the government’s treatment of Toualy. The IJ reasonably concluded that “[t]he chronology just does not work as far as respondent’s story is concerned.” Dehonzai claimed to have made those complaints to his co-workers a full six weeks prior to his May 29, 2000 arrest, and admits he had previously had no difficulty with the government for over eight years. Dehonzai argues this explanation for the IJ’s determination is “too vague.” However, the evidence does not compel a reason *9 able factfinder to accept Dehonzai’s version of how and why his purported arrest occurred.
The IJ also explicitly observed and noted Dehonzai’s “demeanor and manner of response to the straightforward questions,” which it found to be “frequently evasive” and suggestive that Dehonzai “intentionally misunderstfood] the questions that were direct.” Because “the IJ has the best vantage point from which to assess the witnesses’ testimonies and demeanors, we accord significant respect to these witness credibility determinations.” Cuko, 522 F.3d at 37. Numerous instances in the transcript support the IJ’s finding that his answers were vague and unresponsive, and the BIA agreed, as it reasonably could, that Dehonzai was evasive.
Moreover, at various times during the hearings the IJ explicitly stated that Dehonzai’s credibility was in doubt, giving Dehonzai more than fair warning of the need to buttress his case.[8] The IJ even continued proceedings on two occasions to give Dehonzai the opportunity to supplement the record with additional evidentiary support. Despite these warnings and allowances, Dehonzai failed to provide the IJ with adequate corroborating evidence. The BIA and IJ did not err in finding that this failure cast further doubt upon Dehonzai’s credibility. See Matter of Y-B- 21 I. & N. Dec. 1136, 1139 (BIA 1998) (“[T]he weaker an alien’s testimony, the greater the need for corroborative evidence.”).[9] It also supports their determination that he did not meet his burden.
The IJ and BIA noted that Dehonzai failed to submit adequate evidence to prove that Toualy was in fact his cousin. A reasonable factfinder could conclude, like the IJ and BIA, that the corroborating documents Dehonzai did submit — the purported 2004 letter from Toualy and Toualy’s and Dehonzai’s purported birth certificates — were insufficient for Dehonzai’s comments regarding his relationship with Toualy to be deemed credible. Regardless, on petition for review Dehonzai does not challenge this element of the IJ or BIA decisions. The argument is waived. Similarly, it was reasonable for the IJ to disbelieve the authenticity of the purported certificate of investigation — the only corroborating evidence Dehonzai provided to support his claim that he was persecuted on political grounds.
Some inconsistencies that the IJ identified within Dehonzai’s testimony, such as whether his detention in 2000 was for a two or five day period,[10] were more minor, *10 and would not be significant if they stood alone. They are not needed to support the lack of credibility finding, and, more, they do not stand alone. That some of the reasons articulated for the credibility determination are more persuasive than others does not alter the fact that, upon an assessment of the record in its entirety, a reasonable factfinder would not be compelled to make a contrary determination to the finding the BIA and IJ did make. Cuko, 522 F.3d at 37. The credibility determination was based on components of Dehonzai’s testimony that go to the heart of Dehonzai’s asylum claim, see Hoxha v. Gonzales, 446 F.3d 210, 217 (1st Cir. 2006),[11] that “generate specific and cogent reasons from which to infer that petitioner ... provided non-ereditworthy testimony,” Cuko, 522 F.3d at 37, and that Dehonzai did not adequately explain, id. Despite Dehonzai’s attempts to trivialize particular findings of the BIA and IJ, in applying the substantial evidence standard in review of an adverse credibility finding, “the whole sometimes can exceed the sum of the parts, and the appropriate test focuses on the totality of the circumstances.” Mariko v. Holder, 632 F.3d 1, 6-7 (1st Cir.2011). The finding that Dehonzai’s testimony was not credible is supported by substantial evidence.
III.
The adverse credibility determination defeats Dehonzai’s asylum claim. Dine v. Gonzales, 464 F.3d 89, 93 (1st Cir.2006) (“[W]hen a petitioner’s case depends on the veracity of ... testimony, a fully supported adverse credibility determination, without more, can sustain a denial of asylum.” (quoting Olujoke v. Gonzales, 411 F.3d 16, 22 (1st Cir.2005))) (internal quotation marks omitted). Dehonzai’s claims for protection under the CAT and withholding of removal also fail for the same reason. See Balachandran v. Holder, 566 F.3d 269, 274 (1st Cir.2009) (CAT claim fails when based on same non-credible testimony as asylum claim); Dine, 464 F.3d at 93 (withholding of removal claim fails upon upholding adverse credibility finding).
The petition is denied.

. Dehonzai prepared his 2001 asylum application with the assistance of a non-lawyer. Although Dehonzai never asserted that the non-lawyer held himself out as an attorney, during the December 16, 2003 hearing — by which time Dehonzai had received actual counsel — the IJ criticized the non-lawyer’s conduct as potentially constituting the unauthorized practice of law, and subsequently referred the matter to the Massachusetts Board of Bar Overseers.

. Dehonzai also submitted and relied upon reports from the U.S. State Department and Amnesty International to support his refugee claims. These reports discuss the political climate within the Ivory Coast from the early 1990s until the time of Dehonzai’s departure from the Ivory Coast in 2000.

. In his asylum application Dehonzai stated this arrest occurred on May 29, 2000, the same day as his own arrest; in his affidavit and during testimony, he stated it occurred on April 9, 2000. The IJ did not specifically comment on this. The IJ was not required to offer “an explicit holding as to every factor that [he] might find relevant in making a determination,” Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir.2005), and when considering "whether the clarity of an administrative decision is sufficient to support our review ... we are not ... oblivious of the record on which it is based," id. (quoting Xu v. Gonzales, 424 F.3d 45, 49 (1st Cir.2005)) (alteration in original) (internal quotation marks omitted).

. On cross examination, Dehonzai stated that he worked at his job from Monday through Friday, and offered no response when it was noted that April 15, 2000, the day he says he was fired, was a Saturday.

. Within his asylum application, Dehonzai stated he was "detained in the military camp for about 5 days,” but within his affidavit and during testimony, he stated he was detained for two days. We do not consider this discrepancy for our holding.

. Between the March 10, 2006 hearing and the April 6, 2007 hearing, Dehonzai's original counsel withdrew and was replaced by another attorney. It is clear from the April 6, 2007 hearing transcript that Dehonzai’s new counsel understood the IJ's 2006 instruction to provide any additional and available evidence to support Dehonzai’s claims.

. Dehonzai argues that, under the United Nations High Commission of Refugees Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Handbook), his testimony is entitled to the “benefit of the doubt.” Dehonzai failed to raise this argument before the BIA. It is not exhausted. Even if we were to consider the argument, it is unavailing. By its own terms the Handbook does not support Dehonzai’s position, as it makes clear that any deference to the complainant’s testimony does not extend to credibility determinations. See Handbook, at ¶ 196 (“[I]f the applicant's account appears *8 credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt.”) (emphasis added).

.For example, at the March 10, 2006 hearing, the IJ informed Dehonzai that, despite his counsel’s view that Dehonzai’s testimony had not presented any credibility concerns, his credibility remained at issue. At that hearing the IJ also instructed Dehonzai's counsel to submit “anything that occurs to you based on the hearing we’ve had up until now, that would corroborate your client’s testimony” because he "doesn’t have a lot of corroboration.” At the April 6, 2007 hearing, the IJ stated that there were still "some problems for the respondent,” including the "eery similarity” between his description of his mistreatment and Toualy's description of his own mistreatment.

. We note that an applicant’s testimony, “if credible, may be sufficient to sustain [his] burden of proof without corroboration.” 8 C.F.R. § 1208.13(a). But where, as here, the applicant "is found not to be entirely credible, corroborating evidence 'may be used to bolster an applicant's credibility.’ " Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir.2005) (quoting Diab v. Ashcroft, 397 F.3d 35, 40 (1st Cir.2005)); see also Hoxha v. Gonzales, 446 F.3d 210, 219 (1st Cir.2006) (explaining that an IJ may permissibly consider whether corroborating evidence rehabilitates a petitioner’s credibility).

. Nor do we rely on other minor inconsistencies between Dehonzai's 2001 asylum ap *10 plication and his other representations, even though the BIA specifically rejected Dehonzai's explanation that these inconsistencies were the result of inadequate assistance in completing his asylum application.

. Following passage of the REAL ID Act, an adverse credibility determination may be based on an inconsistency in the applicant's testimony "without regard to whether [the] inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. 1158(b)(l)(B)(iii). Because Dehonzai’s asylum application was filed prior to the May 11, 2005 effective date of the Act, the previous standard applies. See Kartasheva v. Holder, 582 F.3d 96, 104 n. 7 (1st Cir.2009) (noting that in pre-REAL ID Act cases, "the IJ's adverse credibility finding 'cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim.' ” (quoting Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir.2008))).