# United States Court of Appeals
## For the First Circuit

No. 09-2071

ALPHONSE DEHONZAI,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Chief Judge</u>,
Boudin and Thompson, <u>Circuit Judges</u>.

<u>Jeffrey B. Rubin</u> was on brief for petitioner.
<u>P. Michael Truman</u>, Trial Attorney, Office of Immigration Litigation, <u>Tony West</u>, Assistant Attorney General, Civil Division, and <u>Keith I. McManus</u>, Senior Litigation Counsel, were on brief for respondent.

May 23, 2011

**LYNCH**, **Chief Judge**.  Alphonse Dehonzai, of the Ivory Coast, petitions for review of a July 10, 2009 order by the Board of Immigration Appeals (BIA).  The BIA, affirming an October 4, 2007 ruling of an Immigration Judge (IJ), denied Dehonzai's application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), finding he had not met his burden under any of those claims.  Dehonzai argues that the BIA erred in finding he had not met his burden because there was error in the IJ's adverse credibility determination.  We deny the petition.  The record does not compel a reasonable factfinder to reach an opposite conclusion as to Dehonzai's failure to meet his burden or as to his credibility.  See 8 U.S.C. § 1252(b)(4)(B).

I.

Dehonzai entered the United States without authorization on July 25, 2000 from the Ivory Coast.  He left his wife, Cecile, their three children, his mother, and three of his siblings there.  In 2001, he applied for asylum, withholding of removal, and protection under the CAT on the basis of political persecution.  His application was denied, and he was deemed eligible for removal and issued a notice to appear on February 22, 2002.  Dehonzai conceded removability but sought leave to seek asylum, protection under the CAT, and withholding of removal.

Dehonzai's refugee claims are predicated upon two separate incidents of arrest and detention in the Ivory Coast in

-2-

1992 and 2000. He described those incidents and relevant background facts to immigration officials on three occasions: (1) within his I-589 asylum application, filed in 2001,[1] (2) within an affidavit executed on November 5, 2004 and submitted to the IJ in 2006, and (3) during testimony at a March 10, 2006 hearing before the IJ, one of four hearings held before the IJ.[2] We describe the facts as set forth within Dehonzai's statements.

Dehonzai was born in the Ivory Coast in 1969. In 1988, he graduated from a vocational school that specialized in accounting. After his graduation, he began working as an accountant at Cocody Medical Center, where he was employed until April 2000.

While a student in 1985, Dehonzai joined the Fédération Estudiantine et Scolaire de Côte D'Ivoire (FESCI), a political organization comprised mainly of Ivorian students. Dehonzai also became involved with the Rassemblement des Républicans (RDR), an opposition political movement led by Allasane D. Ouattara.

---

[1] Dehonzai prepared his 2001 asylum application with the assistance of a non-lawyer. Although Dehonzai never asserted that the non-lawyer held himself out as an attorney, during the December 16, 2003 hearing--by which time Dehonzai had received actual counsel--the IJ criticized the non-lawyer's conduct as potentially constituting the unauthorized practice of law, and subsequently referred the matter to the Massachusetts Board of Bar Overseers.

[2] Dehonzai also submitted and relied upon reports from the U.S. State Department and Amnesty International to support his refugee claims. These reports discuss the political climate within the Ivory Coast from the early 1990s until the time of Dehonzai's departure from the Ivory Coast in 2000.

Dehonzai served as an advisor at the RDR's youth branch in Cocody from 1991 until May 2000.

On February 18, 1992, Dehonzai and other members of both FESCI and RDR participated in a peaceful march of protest against the Ivorian government, primarily seeking the reinstatement of free higher education.  Following the march, Dehonzai and several other members of FESCI and RDR were arrested.  Dehonzai was held in the Cocody police station for three days.  During his 2006 testimony, he stated for the first time that the police kicked him, hit him with wires, and made him do pushups during his 1992 detention.  During his 2006 testimony he also stated for the first time that, following his release in 1992, the police threatened to kill him if he continued to oppose the government.

By his own account, Dehonzai did not have another encounter with government officials after 1992 until 2000.  In the spring of that year, military personnel arrested the journalist Joules Toualy, whom Dehonzai claimed was his cousin.[3]  Dehonzai

---

[3]     In his asylum application Dehonzai stated this arrest occurred on May 29, 2000, the same day as his own arrest; in his affidavit and during testimony, he stated it occurred on April 9, 2000.  The IJ did not specifically comment on this.  The IJ was not required to offer "an explicit holding as to every factor that [he] might find relevant in making a determination," Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005), and when considering "whether the clarity of an administrative decision is sufficient to support our review . . . we are not . . . oblivious of the record on which it is based," id. (quoting Xu v. Gonzales, 424 F.3d 45, 49 (1st Cir. 2005)) (alteration in original) (internal quotation marks omitted).

asserted that two soldiers in plain clothes arrested Toualy at the offices of "Le Jeune Democrate," the newspaper at which Toualy was employed. Toualy was apparently arrested for having written an article regarding military mutiny.

On April 12, 2000, Dehonzai criticized the government's treatment of Toualy to at least twelve of his colleagues at the Cocody Medical Center while they were dining in the employee cafeteria. Dehonzai posited, but offered no proof, that one of those colleagues was aware that Toualy was Dehonzai's cousin and reported him to the Republican Guard--described by Dehonzai as the "local FBI"--sometime thereafter. Dehonzai said he was fired from his job at Cocody Medical Center on April 15, 2000, three days after criticizing Toualy's arrest.

Dehonzai first mentioned his firing at the March 10, 2006 hearing. When asked why he was fired, he replied, "Well, first of all, I went to jail and when I got out of jail, I started working. And after that when the new boss came in and he was a member of the government. And when I started working, they had arrested my cousin." He also testified that in firing him, his new boss told him that he was "not here to do politics" and that Toualy's arrest and treatment were "none of this office's business." Dehonzai provided no further information regarding the relationship between

his termination and his criticism of Toualy or his subsequent arrest.[4]

Dehonzai testified that on May 29, 2000, two soldiers of the Republican Guard entered his house, arrested him, and transported him to the Akwedo military camp where he was placed in a small cell. Dehonzai claims his arrest and detention occurred as a direct result of the statements criticizing Toualy's arrest that he made six weeks prior. Other than his own testimony there is no evidence that he was arrested, detained or persecuted in 2000.

Dehonzai maintains that he was detained for two days,[5] during which he was subjected to various forms of mistreatment, including being beaten, kicked, and flogged with wires. In his asylum application and his affidavit, Dehonzai gave a vivid description of his mistreatment following his arrest. He stated: "They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back."

This description virtually copies Toualy's description of his own arrest and detention. Toualy's description was published in a September 19, 2000 Amnesty International report submitted by

---

[4] On cross examination, Dehonzai stated that he worked at his job from Monday through Friday, and offered no response when it was noted that April 15, 2000, the day he says he was fired, was a Saturday.

[5] Within his asylum application, Dehonzai stated he was "detained in the military camp for about 5 days," but within his affidavit and during testimony, he stated he was detained for two days. We do not consider this discrepancy for our holding.

Dehonzai in support of his refugee claims: "They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back."

When questioned as to why his description of his mistreatment in 2000 was nearly identical to the description used by Toualy within the Amnesty International Report, Dehonzai did not directly answer. He said, rather, "I apologize." He went on to say, "In Africa when they've sent you to the police station, and when they beat you, they do, that's what the police does. You have to, they kick you. You have to be strong. And you have to crawl in water." This last assertion regarding crawling in water was one he had not given before.

Upon his release from the Akwedo military camp in 2000, Dehonzai says he was told by police that "next time, we're going to kill you for good." Fearful of returning to his own home, Dehonzai testified he stayed at the home of his cousin, Jean Baptiste. While there, Dehonzai says he learned through word of mouth that military personnel had gone to his home and inquired as to his whereabouts. Frightened by the news of their visit, Dehonzai procured another person's passport with the help of Jean Baptiste and fled the Ivory Coast without his wife or three children, whom he believes are still in the Ivory Coast but with whom he now has no contact. Dehonzai also left his mother and three of his siblings behind in the Ivory Coast. At no time has Dehonzai

asserted that any of his relatives were ever subject to persecution by the Ivory Coast government while there.

Dehonzai traveled directly from the Ivory Coast to the United States, arriving in New York's John F. Kennedy Airport on July 25, 2000.

At the March 10, 2006 hearing, Dehonzai was specifically asked to clarify certain elements of this factual account, and was often asked to do so repeatedly in light of the IJ's view that he was evasive in answering questions. He was asked several times to provide information regarding the passport he used to enter the United States, including the name that was used on the document. Dehonzai refused to provide any information, stating "when my cousin got me this document, he had me swear because if I give the name, they're going to kill my family." Later, at an April 6, 2007 hearing, Dehonzai did submit the name used on the passport.

When asked to provide support for his claim that Joules Toualy was his cousin, Dehonzai submitted a letter allegedly from Toualy--written by hand, in French, and dated April 12, 2004--which states:

> Good morning cousin Alphonse,
> Life difficulties contribute to the formation of a human being. I believe you know that. Here the situation remains critique specially in the political plan. The assault to the residences, murder, and denunciation do happen frequently. Probably if you were there you would be dead or disappeared like the others. The case of your handsome Toh Laurent since 2003 it is palpable. Even the pianist Marcelin Yace and the comedian H

-8-

would be killed by the unknown. It is how the
fear is here. In hiding, at moment, I wrote this
letter, I have no news about your children.
I stop here.
God be with you and regards to yours.
Yours,
Jules Toualy

There was no corroborating evidence the letter was in fact from Toualy or that Toualy was in fact Dehonzai's cousin. Although he was asked at the March 2006 hearing to provide additional support for his claim that Toualy was his cousin before his next hearing in April 2007, Dehonzai did not do so. Eventually, in a June 2007 submission to the IJ, he provided documents which he said were his and Toualy's birth certificates.

The IJ repeatedly informed Dehonzai and his attorney that Dehonzai's credibility was at issue. The IJ specifically noted Dehonzai's failure to provide information as to the passport he used to enter the United States. The IJ observed that because no information regarding the passport was submitted and there was no other corroborating evidence regarding Dehonzai's entry date, "[i]t's going to be a tough call for me to say that [he] met his burden of proof on timeliness, particularly when the respondent declines, when asked, to provide that information, the very information that could corroborate or not." This was pertinent to the requirement that asylum applications be filed within one year of the applicant's date of entry. See 8 U.S.C. § 1158(a)(2)(B).

The IJ also noted the lack of corroborating evidence regarding Dehonzai's relationship with Toualy.

The March 10, 2006 hearing was continued to April 6, 2007, partially to give Dehonzai more time to prove his claims, particularly in light of the IJ's questions about credibility. When Dehonzai's attorney inquired as to the scope of additional evidence he should provide in advance of the April 2007 hearing, the IJ responded, "what you have to do is anything that occurs to you based on the hearing we've had up until now, that would corroborate your client's testimony. He doesn't have a lot of corroboration. That doesn't mean it's not true. But I'm just short of good pre-cross-examination. So, nota bene."

Despite these warnings, Dehonzai's counsel[6] provided little in the way of corroborating evidence before or at the April 6, 2007 hearing. Dehonzai failed to produce the passport that he used to enter the United States, and instead only revealed that "Alphonse Bah" was the name on the passport. The only other evidence he offered at the April 6, 2007 hearing--besides additional reports on country conditions in the Ivory Coast--was a paper labeled "certificate of individual investigation," a document

---

[6]     Between the March 10, 2006 hearing and the April 6, 2007 hearing, Dehonzai's original counsel withdrew and was replaced by another attorney. It is clear from the April 6, 2007 hearing transcript that Dehonzai's new counsel understood the IJ's 2006 instruction to provide any additional and available evidence to support Dehonzai's claims.

purportedly procured from the Ivory Coast government, though no government entity is identified in it, which states that Dehonzai was under investigation for his political activities. During the hearing, the IJ stated that the paper was "highly unlikely to be real" as he could not "imagine any kind of an organization that does investigatory work for the government to certify that somebody is under investigation for political activities." The IJ again stated on the record that "there were some problems for the respondent," including that there is an "eery similarity" between Dehonzai's description of his treatment in detention and Toualy's description of his own treatment.

The IJ once again delayed issuing his decision and continued proceedings so that Dehonzai might further corroborate his testimony. In June 2007 Dehonzai submitted copies of allegedly official birth certificates for himself and Toualy. No other corroborating evidence was ever provided.

The IJ issued his decision in an October 4, 2007 oral ruling. First, the IJ observed that Dehonzai stated his date of entry into the United States was July 25, 2000, and that although his I-589 was date-stamped July 27, 2001, Dehonzai had signed the form on May 30, 2001. In light of these facts, the IJ stated he was "inclined to give the respondent the benefit of the doubt as to a good faith effort to make a timely filing," and deemed Dehonzai's asylum application timely under 8 U.S.C. § 1158(a)(2)(B).

-11-

The IJ next turned to the issue of Dehonzai's credibility, finding him not credible and articulating a number of specific grounds for the adverse credibility determination. For purposes of judicial review, we set forth three: (1) the language in Dehonzai's asylum application and affidavit about his own detention and mistreatment that virtually copies Toualy's description in the September 19, 2000 Amnesty International Report submitted by Dehonzai, and the IJ's view that Dehonzai's response was inadequate as to why the replication existed; (2) the IJ's assessment of the implausibility of Dehonzai's assertions, specifically the unlikelihood that he would be arrested a full six weeks after he claimed to have criticized Toualy's arrest in a work setting, which Dehonzai said was the triggering event for his own 2000 arrest; and (3) the IJ's evaluation, after observing Dehonzai and listening to his testimony, that Dehonzai was evasive, avoided answering questions, and was unable to provide detailed testimony at the March 10, 2006 hearing. In addition, the IJ noted Dehonzai's failure to provide corroborating evidence to support his claims, despite having been requested to do so.

The IJ rejected Dehonzai's asylum claim on the basis of the adverse credibility finding. Having rejected Dehonzai's asylum claim, the IJ determined he was not entitled to withholding of removal or protection under the CAT.

Dehonzai appealed to the BIA, primarily challenging the IJ's credibility determination. The BIA denied the appeal. It found no error in the IJ's adverse credibility determination, holding that the IJ articulated specific "discrepancies in the respondent's testimony which are present in the administrative record and go to the heart of his claim, implausibilities in the respondent's account of events and chronology, use of nearly identical language as that used in an Amnesty International report to describe his own experience, and evasive demeanor." With regard to the specific inconsistencies between Dehonzai's 2001 asylum application and Dehonzai's other representations to immigration officials, the BIA rejected Dehonzai's explanation that those inconsistencies resulted from the fact that he was aided by a non-lawyer who did not speak his particular dialect of French, and who allegedly put down false information on Dehonzai's asylum application. The BIA noted both that Dehonzai was represented by counsel from 2003, and that "the respondent swore to the veracity of the information in his application and at no point prior to the merits hearing or in his direct presentation of evidence [in 2006] did he recant any of the information in his 2001 application as inaccurate." The BIA also found that Dehonzai had offered no explanation "as to why the non-lawyer [who assisted with Dehonzai's I-589 asylum application] would have changed the substance of the information that the respondent had given him to reflect different

-13-

dates, periods of detention, or other details than the respondent provided." The BIA observed that "the only letter he submitted in an attempt to corroborate the substance of his claim of being a refugee did not address the factual circumstances of his claim," and found he failed to meet his burden of proof.

## II.

Dehonzai petitions for review, arguing that the BIA erred in finding no error in the IJ's adverse credibility determination.

We review factual findings, including credibility determinations, under the familiar substantial evidence standard. Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009). Credibility determinations and other "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Cuko v. Mukasey, 522 F.3d 32, 37 (1st Cir. 2008). "Merely identifying alternative findings that could be supported by substantial evidence is insufficient to supplant the [IJ's and BIA's] findings." Albathani v. INS, 318 F.3d 365, 372 (1st Cir. 2003).

Ordinarily, we review the decision of the BIA, but we also "review those portions of the IJ's opinion that the BIA has adopted." See Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004); see also Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004) ("[W]hen the BIA both adopts the findings of the IJ and discusses

-14-

some of the bases for the IJ's decision, we have authority to review the decisions of both the IJ and the BIA.").[7]

There is no doubt the inconsistencies identified by the IJ and the BIA appear in the record. Dehonzai argues, rather, that in rendering its credibility determination, the IJ "harped upon minor inconsistencies" and ignored the "ample amount of evidence" that he submitted to support his claims. That some of the discrepancies relied upon were more significant than others does not undercut the conclusion of the BIA and IJ. The BIA and IJ decisions are supported by substantial evidence on key points. A reasonable factfinder could find that Dehonzai's description of his mistreatment in the same words as Toualy was not creditworthy, that no other evidence supported Dehonzai's claims, and that the inconsistencies in Dehonzai's testimony were not adequately explained. A reasonable factfinder could also conclude that Dehonzai failed to provide adequate supporting material to

---

[7] Dehonzai argues that, under the United Nations High Commission of Refugees Handbook on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees (Handbook), his testimony is entitled to the "benefit of the doubt." Dehonzai failed to raise this argument before the BIA. It is not exhausted.

Even if we were to consider the argument, it is unavailing. By its own terms the Handbook does not support Dehonzai's position, as it makes clear that any deference to the complainant's testimony does not extend to credibility determinations. See Handbook, at ¶ 196 ("[I]f the applicant's account appears credible, he should, unless there are good reasons to the contrary, be given the benefit of the doubt.") (emphasis added).

-15-

substantiate his claim after he was explicitly warned that his credibility was in question.

The BIA and IJ found it particularly troubling that the language Dehonzai used within his asylum application and affidavit to describe his mistreatment in 2000 was virtually identical to the language attributed to Toualy within the Amnesty International report. The IJ reasonably concluded this "suggests . . . that the respondent has adopted the Toualy story for his own purposes." Dehonzai argues that the similarity in language was "mere coincidence." But the replication was severe, and neither the IJ nor the BIA was required to view this as "mere coincidence." Dehonzai wrote in 2001 and 2004: "They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back." Toualy's description, as published in the 2000 Amnesty International report, was: "They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back." The BIA and IJ's conclusions were reasonable and supported.

Moreover, on two different occasions Dehonzai was asked and "afforded 'a reasonable opportunity to explain'" why, in both his 2001 asylum application and his 2004 affidavit, he had used language that so closely replicated the language Toualy used to describe his own experiences. Cuko, 522 F.3d at 39 (quoting Zi Lin Chen v. Ashcroft, 362 F.3d 611, 618 (9th Cir. 2004)). It was

-16-

reasonable for the BIA and IJ to conclude the explanations offered were inadequate. Upon being asked at the March 10, 2006 hearing why the language within his asylum application and affidavit virtually copied Toualy's description, Dehonzai did not assert his description was accurate. At the April 6, 2007 hearing, the IJ once again noted the "eery similarity" between Dehonzai's statements and Toualy's first-person account, but Dehonzai again failed to offer any explanation as to why that near identicality existed.

The BIA and IJ also found it implausible that Dehonzai was arrested, as he posited, as a result of his complaints to co-workers at work about the government's treatment of Toualy. The IJ reasonably concluded that "[t]he chronology just does not work as far as respondent's story is concerned." Dehonzai claimed to have made those complaints to his co-workers a full six weeks prior to his May 29, 2000 arrest, and admits he had previously had no difficulty with the government for over eight years. Dehonzai argues this explanation for the IJ's determination is "too vague." However, the evidence does not compel a reasonable factfinder to accept Dehonzai's version of how and why his purported arrest occurred.

The IJ also explicitly observed and noted Dehonzai's "demeanor and manner of response to the straightforward questions," which it found to be "frequently evasive" and suggestive that

-17-

Dehonzai "intentionally misunderst[ood] the questions that were direct." Because "the IJ has the best vantage point from which to assess the witnesses' testimonies and demeanors, we accord significant respect to these witness credibility determinations." Cuko, 522 F.3d at 37. Numerous instances in the transcript support the IJ's finding that his answers were vague and unresponsive, and the BIA agreed, as it reasonably could, that Dehonzai was evasive.

Moreover, at various times during the hearings the IJ explicitly stated that Dehonzai's credibility was in doubt, giving Dehonzai more than fair warning of the need to buttress his case.[8] The IJ even continued proceedings on two occasions to give Dehonzai the opportunity to supplement the record with additional evidentiary support. Despite these warnings and allowances, Dehonzai failed to provide the IJ with adequate corroborating evidence. The BIA and IJ did not err in finding that this failure cast further doubt upon Dehonzai's credibility. See Matter of Y-B-, 21 I. & N. Dec. 1136, 1139 (BIA 1998) ("[T]he weaker an alien's testimony, the greater the need for corroborative

---

[8] For example, at the March 10, 2006 hearing, the IJ informed Dehonzai that, despite his counsel's view that Dehonzai's testimony had not presented any credibility concerns, his credibility remained at issue. At that hearing the IJ also instructed Dehonzai's counsel to submit "anything that occurs to you based on the hearing we've had up until now, that would corroborate your client's testimony" because he "doesn't have a lot of corroboration." At the April 6, 2007 hearing, the IJ stated that there were still "some problems for the respondent," including the "eery similarity" between his description of his mistreatment and Toualy's description of his own mistreatment.

evidence.").[9] It also supports their determination that he did not meet his burden.

The IJ and BIA noted that Dehonzai failed to submit adequate evidence to prove that Toualy was in fact his cousin. A reasonable factfinder could conclude, like the IJ and BIA, that the corroborating documents Dehonzai did submit--the purported 2004 letter from Toualy and Toualy's and Dehonzai's purported birth certificates--were insufficient for Dehonzai's comments regarding his relationship with Toualy to be deemed credible. Regardless, on petition for review Dehonzai does not challenge this element of the IJ or BIA decisions. The argument is waived. Similarly, it was reasonable for the IJ to disbelieve the authenticity of the purported certificate of investigation--the only corroborating evidence Dehonzai provided to support his claim that he was persecuted on political grounds.

Some inconsistencies that the IJ identified within Dehonzai's testimony, such as whether his detention in 2000 was for

---

[9] We note that an applicant's testimony, "if credible, may be sufficient to sustain [his] burden of proof without corroboration." 8 C.F.R. § 1208.13(a). But where, as here, the applicant "is found not to be entirely credible, corroborating evidence 'may be used to bolster an applicant's credibility.'" Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005) (quoting Diab v. Ashcroft, 397 F.3d 35, 40 (1st Cir. 2005)); see also Hoxha v. Gonzales, 446 F.3d 210, 219 (1st Cir. 2006) (explaining that an IJ may permissibly consider whether corroborating evidence rehabilitates a petitioner's credibility).

a two or five day period,[10] were more minor, and would not be significant if they stood alone. They are not needed to support the lack of credibility finding, and, more, they do not stand alone. That some of the reasons articulated for the credibility determination are more persuasive than others does not alter the fact that, upon an assessment of the record in its entirety, a reasonable factfinder would not be compelled to make a contrary determination to the finding the BIA and IJ did make. Cuko, 522 F.3d at 37. The credibility determination was based on components of Dehonzai's testimony that go to the heart of Dehonzai's asylum claim, see Hoxha v. Gonzales, 446 F.3d 210, 217 (1st Cir. 2006),[11] that "generate specific and cogent reasons from which to infer that petitioner . . . provided non-creditworthy testimony," Cuko, 522 F.3d at 37, and that Dehonzai did not adequately explain, id.

---

[10]    Nor do we rely on other minor inconsistencies between Dehonzai's 2001 asylum application and his other representations, even though the BIA specifically rejected Dehonzai's explanation that these inconsistencies were the result of inadequate assistance in completing his asylum application.

[11]    Following passage of the REAL ID Act, an adverse credibility determination may be based on an inconsistency in the applicant's testimony "without regard to whether [the] inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. 1158(b)(1)(B)(iii). Because Dehonzai's asylum application was filed prior to the May 11, 2005 effective date of the Act, the previous standard applies. See Kartasheva v. Holder, 582 F.3d 96, 104 n.7 (1st Cir. 2009) (noting that in pre-REAL ID Act cases, "the IJ's adverse credibility finding 'cannot rest on trivia but must be based on discrepancies that involved the heart of the asylum claim.'" (quoting Hem v. Mukasey, 514 F.3d 67, 69 (1st Cir. 2008))).

-20-

Despite Dehonzai's attempts to trivialize particular findings of the BIA and IJ, in applying the substantial evidence standard in review of an adverse credibility finding, "the whole sometimes can exceed the sum of the parts, and the appropriate test focuses on the totality of the circumstances." Mariko v. Holder, No. 09-1464, slip op. at 10 (1st Cir. Jan. 24 2011). The finding that Dehonzai's testimony was not credible is supported by substantial evidence.

### III.

The adverse credibility determination defeats Dehonzai's asylum claim. Dine v. Gonzales, 464 F.3d 89, 93 (1st Cir. 2006) ("[W]hen a petitioner's case depends on the veracity of . . . testimony, a fully supported adverse credibility determination, without more, can sustain a denial of asylum." (quoting Olujoke v. Gonzales, 411 F.3d 16, 22 (1st Cir. 2005))) (internal quotation marks omitted). Dehonzai's claims for protection under the CAT and withholding of removal also fail for the same reason. See Balachandran v. Holder, 566 F.3d 269, 274 (1st Cir. 2009) (CAT claim fails when based on same non-credible testimony as asylum claim); Dine, 464 F.3d at 93 (withholding of removal claim fails upon upholding adverse credibility finding).

The petition is denied.

**-Dissenting Opinion Follows-**

-21-

**THOMPSON**, <u>Circuit Judge</u>, **dissenting.** The difficulty of balancing deference against deficiency in the immigration context provokes divided panels from time to time. <u>See</u>, <u>e.g.</u>, <u>Mejilla-Romero</u> v. <u>Holder</u>, 600 F.3d 63, 76 (1st Cir. 2010) (Stahl, J., dissenting), <u>vacated on reh'g</u>, 614 F.3d 572 (2010); <u>Rasiah</u> v. <u>Holder</u>, 589 F.3d 1, 6 (1st Cir. 2009) (Lipez, J., dissenting); <u>Cuko</u> v. <u>Mukasey</u>, 522 F.3d 32, 41 (1st Cir. 2008) (Cyr, J., dissenting). Unfortunately, today I find myself alone on such a panel.[12] I cannot conscientiously join my colleagues in upholding the IJ's and BIA's error-riddled decisions denying asylum relief to Petitioner Alphonse Dehonzai. This is a case where, it seems to me, the degree of deference the majority exercises "turns our review function into a hollow exercise in rubber-stamping." <u>Cuko</u>, 600 F.3d at 41 (Cyr, J., dissenting). Accordingly, I dissent.

## Background

The record viewed as a whole – including documentary evidence of conditions in Côte D'Ivoire – reveals the following:

On July 25, 2000, Dehonzai obtained entry to the United States by presenting a friend's passport on arrival at J.F.K. Airport in New York, New York. About a year later he filed for asylum and other relief.

---

[12] There is one exception: I agree with footnote 7 of the majority opinion.

When Dehonzai left Côte D'Ivoire, the country had suffered from years of turmoil. According to the earliest information provided by Dehonzai – a 1992 Amnesty International report – following political demonstrations in February 1992, more than 250 people were wrongfully arrested and detained. The protesters, many of whom were members of the Fédération Estudiantine et Scolaire de Côte d'Ivoire (FESCI), objected to the Ivorian government's decision not to punish General Robert Gueï for ordering an army raid on Abidjan University that resulted in students being beaten and raped. Some of those arrested were released, others were held without charges, and still others, including persons who did not actually participate in the demonstrations, were charged with crimes of association.

Years later, in December 1999, the Ivorian army seized power of Côte D'Ivoire and installed General Gueï as Head of State. In the wake of the coup, political freedom declined: members of the deposed government were arrested by soldiers, members of opposition parties were required to have government clearance to move about or to leave the country, and political demonstrations were banned. Search warrants, often lacking a name or address, were issued and executed freely; government watchdogs suspected that private correspondence was routinely and widely monitored. Soldiers attacked friends and relatives of politicians, beating them with guns, forcing them to do pushups

and crawl on the ground, binding and kicking them, and threatening them with death. Soldiers sometimes arrested and abused civilians on the basis of simple denunciations, without any efforts to investigate or corroborate the claims. According to the U.S. Department of State, it became common for civilians to be detained – often at Akouedo military camp – for days without being charged. Perhaps most disturbingly, the military regime maintained a practice of summarily executing civilians, including students and civil servants, often on the basis of simple denunciations and without any investigation or concrete evidence of wrongdoing. Some of the most common targets of the post-coup Ivorian regime included supporters of Alassane Ouattara,[13] leader of the political party Rassemblement des Républicains (RDR), students and FESCI members, and journalists.

Dehonzai included material detailing all these facts with his application. In addition, Dehonzai represented in his application that he had served as an advisor to Ouattara and FESCI, that he had been arrested and detained for three days after participating in one of the 1992 protests, and that he had been arrested and detained after criticizing the government's

---

[13] To depart from the record briefly, Ouattara was elected President of Côte D'Ivoire in 2010. After months of bloody struggle against outgoing President Laurent Gbagbo, Ouattara appears to have gained control. The situation is now mixed: although the conflict seems to have ended, Ivorians continue to flee to refugee camps in neighboring Guinea and Liberia, and human rights inspectors continue to discover unmarked mass graves.

abuse of his journalist cousin in 2000. Regarding the latter incident, the application included the following representation (sic): "I was severaly beaten as they did for my cousin Jules Toualy. They beat me with a bundle of electric wire with tennis ball at the end, the ball continually struck my back." The application also referred specifically to an attached exhibit, an Amnesty International report which included an account of the government's detention and abuse of Jules Toualy. This document contained a first-person account of Mr. Toualy's experience, including the following phrase: "They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back." Finally, the application represented that Dehonzai had been detained "for about 5 days . . . tortured and severly [sic] beaten." Dehonzai signed the I-589 and dated the form May 30, 2001; Al Mondel, who was listed as the form's preparer, signed the form and dated it June 15, 2001.

The INS denied the application and instead initiated removal proceedings. On December 16, 2003, Dehonzai appeared in immigration court and conceded his removability but sought leave to pursue asylum and other relief. A series of hearings ensued, during which Dehonzai testified that he had a fear of persecution stemming largely from the 1992 and 2000 incidents.

Regarding the 1992 incident, Dehonzai testified to the following facts. In February 1992, Dehonzai was arrested for his

participation in one of the student marches stemming from the raid on Abidjan University. He was held for three days, over the course of which he was interrogated, kicked, beaten with wires, forced to stoop, and forced to do pushups. At the end of the three-day period, he was released.

Regarding the 2000 incident, Dehonzai testified to the following facts. Dehonzai's cousin, the journalist Jules Toualy, was arrested and beaten by agents of the Ivorian government. On April 12, 2000, Dehonzai spoke out at work against the detention and torture of his cousin. Among the approximately twelve people who heard Dehonzai's speech was a government informant who reported Dehonzai to the government. On the night of May 29, 2000, government agents forcibly entered Dehonzai's home and removed him to Akouedo military camp. He was held for two days, over the course of which he was beaten with wood, beaten with wires, kicked, and threatened with death. At the end of the two-day period, he was released.

At a subsequent hearing, the IJ issued an oral decision denying relief on the ground that Dehonzai's testimony lacked credibility. The IJ based his decision on several factors, including chronological implausibilities, language mirroring the Amnesty International report, and Dehonzai's evasive manner of answering questions. Dehonzai appealed the IJ's decision to the BIA, which dismissed his appeal and ordered him removed. This

petition for review followed.  The majority denies the petition;
I would grant it and remand.

## Our Review of Credibility

The majority's decision hinges on upholding the IJ and
BIA's adverse credibility determination.  It is true that we
review credibility determinations under the deferential
substantial evidence standard.  See Kartasheva v. Holder, 582
F.3d 96, 105 (1st Cir. 2009).  The majority spells out our
general policy of deference but implies that deference is the
alpha and omega of our review.  This is not so.

Instead, we have recognized that "the fact that an IJ
considers a petitioner not to be credible constitutes the
beginning not the end of our inquiry." Wiratama v. Mukasey, 538
F.3d 1, 4 (1st Cir. 2008) (quoting Aguilera-Cota v. I.N.S., 914
F.2d 1375, 1381 (9th Cir. 1990)).  "[O]ur deference is not
unlimited," Kartasheva, 582 F.3d at 105, and thus we must
determine whether the IJ's determination has "sturdy roots in the
administrative record," looking to the IJ's decision for
"specific and cogent reasons why an inconsistency, or a series of
inconsistencies, render the alien's testimony not credible."
Wiratama, 538 F.3d at 4 (internal quotation marks removed).
"[W]e may not affirm the agency's decision when we cannot
conscientiously find that the evidence supporting that decision
is substantial, when viewed in the light that the record in its

-27-

entirety furnishes, including the body of evidence opposed to the agency's view." Sok v. Mukasey, 526 F.3d 48, 53 (1st Cir. 2008) (quoting Mukamusoni v. Ashcroft, 390 F.3d 110, 119 (1st Cir. 2004) (internal quotation marks and brackets removed)). Finally, because Dehonzai's petition pre-dates the REAL ID Act, the IJ's adverse credibility determination must be founded on inconsistencies that "go to the heart of the claim and pertain to material facts, not merely to peripheral or trivial matters." Kartasheva, 582 F.3d at 105 (internal quotation marks removed). These principles are well-recognized.

Indeed, applying our standard of review to past cases, we have held that remand on the issue of credibility is required where "the IJ and [BIA] misstate [an immigrant's] testimony, apply labels (like inconsistent and evasive) that are at odds with what the transcript shows, and draw inferences that appear wholly speculative and without record support." Castaneda-Castillo v. Gonzales, 488 F.3d 17, 24 (1st Cir. 2007) (en banc). We have also held that remand is required where the IJ's decision rests on specifically enumerated but "ultimately inadequate reasons," and where "numerous translation difficulties" undercut an IJ's finding of inconsistent testimony or evasive demeanor. Kartasheva, 582 F.3d at 105-06, 107. To anchor these holdings firmly to their statutory basis at 8 U.S.C. § 1252(b)(4)(B), where determinations of the immigration courts reflect these

-28-

sorts of deficiencies, "any reasonable adjudicator would be compelled to conclude to the contrary." Immigration courts may not simply say "not credible" and free their faulty decisions from the fetters of robust judicial review.

I am convinced that those authorities applied to these facts compel remand. My reasoning follows.

### Virtually Identical Language

The majority begins with Dehonzai and Toualy's "virtually identical" language regarding their respective beatings with a bundle of wire with a tennis ball on the end. The IJ found the linguistic similarity troubling and concluded that Dehonzai had "adopted the Toualy story for his own purposes." The BIA and the majority agree. But I find myself compelled to conclude otherwise: the IJ failed to consider carefully the nature of the similarity, failed to apply adequate procedural safeguards, ignored corroborating evidence, and therefore erred.

In seeking affirmance of the BIA and IJ's adverse credibility determination on the basis of similar language, the government relies in large part on Mei Chai Ye v. U.S. Dept. of Justice, 489 F.3d 517 (2d Cir. 2007), where a panel of the Second Circuit upheld an adverse credibility determination based on the immigrant's use of similar language to another immigrant from another set of proceedings. Id. at 520. I agree that the case

-29-

is helpful, and I would follow it.  The case deserves a thorough discussion.

In Ye, the petitioner Mei Chai Ye sought asylum, withholding of removal, and CAT protection on the basis of two forced abortions she claimed to have suffered in her native China.  489 F.3d at 520.  In support of her application for relief, she filed a statement detailing her alleged treatment in China.  Id.  At a hearing on June 13, 2003, the IJ noted that Ye's statement bore certain striking similarities to a statement filed by another applicant in an entirely unrelated case.  Id. The IJ requested that DHS produce redacted versions of the two statements so he could compare the two without impacting either's privacy; DHS agreed.  Id. at 521.

At the next hearing, DHS produced the documents (demonstrating that the IJ's recollection had been spot-on), and the IJ gave Ye's attorney a chance to respond to the similarities.  489 F.3d at 521.  The attorney suggested that the similarities could be due to "a pattern of practice of the Chinese government" or a consistent style of translation if the statements had been translated by the same person.  Id.  The hearing adjourned without any resolution.  Id.  Another hearing followed, at which the IJ noted that he had provided the attorneys with carefully annotated versions of the statements, pointing out each of the many similarities.  Id. at 522.  He

again sought an adequate explanation for these near-identical documents, but again no resolution occurred. Id. Still another hearing followed, at which point Ye's attorney withdrew due to a conflict, and the IJ finally issued an oral decision. Id. The IJ denied Ye any relief, finding that her credibility had been demolished by twenty-three discrete portions of the statement whose language, grammar, and order were all but identical to corresponding portions of the statement that had been filed by an unrelated applicant in an unrelated case. Id. at 522-23. The IJ specifically based this finding of unreliability on (1) Ye's failure to provide any convincing explanation for the similarities despite opportunities at multiple hearings, (2) the absence of any evidence attributing the similarity to a translator, and (3) the absence of evidence that the other petitioner might have plagiarized Ye. Id. at 523. Ye appealed this decision to the BIA, which summarily affirmed; a petition to the Second Circuit followed. Id.

A panel of the Second Circuit denied Ye's petition for review, citing the IJ's careful consideration of possible reasons for the damaging similarities and his meticulous adherence to a number of procedural precautions. 489 F.3d at 524-25. Specifically, the court issued its holding in the form of a multi-pronged rule that an adverse credibility determination may be appropriate where an IJ: "(1) carefully identifies any

similarities; (2) closely considers the nature and number of those particular similarities . . . and (3) rigorously complies with . . . [certain] procedural protections . . . ." Id. at 526. Expounding on the third prong, the court listed some specific procedural protections, recommending that an IJ allow an applicant (a) to respond to the allegedly offending similarities, (b) to investigate potential plagiarism, and (c) to consider the possibility of inaccurate or formulaic translation. Id. However, the court suggested that these enumerated protections were a floor, not a ceiling, noting that the IJ had gone much further by:

> (1) notifying Ye of the similarities, and providing her with copies of his annotations; (2) openly and exhaustively expressing to Ye his concerns about the inter-proceeding similarities; (3) granting Ye several opportunities to comment on those similarities; and (4) inviting Ye to offer evidence of plagiarism, inaccurate translations, or any other possible innocent explanation.

Id. at 525. The court strongly suggested that adherence to the IJ's cautious and deliberate procedure was the better course of action. Id. at 527.

Throughout the opinion, the court followed a general policy of reviewing an IJ's reliance on inter-proceeding similarities "with an especially cautious eye." 489 F.3d at 520. Indeed, the court suggested that an IJ's full compliance with the rule above should result not in affirmance but only in deference;

-32-

on the other hand, any "less rigorous approach" by an IJ should be met with outright skepticism. Id. at 527. I offer an analysis under the Ye framework; given the peculiarity of finding a statement less reliable because of close corroboration, it seems only appropriate that we ought to review the procedure and analysis the IJ followed here with the especially cautious eye prescribed by the Second Circuit.

First, the IJ here did not carefully identify the offending linguistic similarity before issuing his decision. Instead, he noted broadly that "there is a eery [sic] similarity between what happened to Mr. Toualy and what happened to the respondent." In context, this statement doesn't even seem addressed to linguistic similarity, but rather to the timing of Dehonzai's and Toualy's arrests. The IJ's lack of clarity here contrasts sharply with the IJ's meticulous annotations in Ye. See 489 F.3d at 525. My skepticism is therefore piqued. See id. at 527.

Second, the IJ did not closely consider the nature or the number of the single similarity at issue here. Had he done so, he would have noticed that Dehonzai introduced his statement with the phrase "as they did for my cousin Jules Toualy" and went on to refer explicitly to the Amnesty International report. Dehonzai's choice to call the government's attention to this similar language is more consistent with proper citation and

comparison than with plagiarism. Also, had the IJ closely considered the similarity at issue, he would have recognized that the two documents could easily reflect the respective stories of cousins who were held at the same military camp by the same repressive regime six weeks apart, and subjected to a single instance each of the same mistreatment among other disparate abuses. The intertwined nature of the accounts at issue here stands in sharp contrast to the facts in Ye, which involved unaffiliated immigrants in unrelated proceedings whose statements matched point by point on at least twenty-three different details. See 489 F.3d at 522-23. These circumstances are different enough that they alone practically compel a different result. Indeed, the nature and number of the similarity here – a single, appropriately cited instance of similar treatment occurring at the same place within a narrow time frame – cannot reasonably support a finding of fabrication or plagiarism.

Third, the IJ did not rigorously adhere to any of the procedural protections spelled out in Ye. Contrary to the majority's conclusion, he did not afford Dehonzai any opportunity to explain the similar language, except to the extent that he allowed the following exchange to take place during cross examination:

> DHS: You copied that, didn't you, sir, out of an article you read about Jules Toualy, didn't you, sir? The Amnesty International article where Jules Toualy gave a statement

-34-

and said, the last line he said, that was not enough for them. They beat me again with a bundle of electric wire with a tennis ball at the end. The ball continually struck my back. The exact same words that you use in your application, right, sir?

Dehonzai: I apologize. In Africa when they've sent you to the police station, and when they beat you, they do, that's what the police does. You have to, they kick you. You have to be strong. And you have to crawl in water.

DHS: Well, sir, there's nothing.

Dehonzai: They don't really feed you, most people. I'm sorry. I've just described what they do continually all the time.

Allowing the government to ask a heated, accusatory, compound question is hardly equivalent to the sort of careful, objective, and repeated prompts that characterized the IJ's approach in Ye. Cf. 489 F.3d at 520-22. And here the IJ's observation of the "eery similarity" between Dehonzai's and Toualy's situations, which the majority cites as providing a "reasonable opportunity" for Dehonzai to explain the similar language, says nothing of the similar language but instead has to do with the timing of Dehonzai's and Toualy's arrests. In fact, I can discern no procedural protections whatsoever in the IJ's approach here. Thus, all three Ye factors counsel strongly against the IJ's decision.

Other factors counsel rejection of linguistic similarity as a basis for finding Dehonzai not credible. The Ye

-35-

court noted at one point the danger that "similarities may have been inserted into the documents by the translators rather than by the applicants themselves." 489 F.3d at 524. Given that Dehonzai testified that he did not speak English at the time his application was prepared, the IJ ought to have considered whether the similar language might be attributable to the translator rather than Dehonzai himself. More importantly, though, there is ample material in the record to suggest that the language that troubled the IJ is an accurate description of Dehonzai's experience. In fact, all of the evidence suggests that both Dehonzai and Toualy were arrested, detained, and abused by the same regime at the same military camp. The Toualy letter corroborates the familial relationship between him and Dehonzai.[14] The Amnesty International and State Department country reports corroborate the regular arrest and detention at Akouedo of journalists (including Toualy specifically) and civilians denounced for expressing their political beliefs. The country reports also demonstrate that civilians in detention were commonly beaten with objects ranging from iron bars to whips.[15]

---

[14] This is difficult to square with the IJ's specific and incorrect finding that "[t]he respondent was unable to produce any documentation to corroborate his alleged relationship with Jules Toualy." (Emphasis added.) It seems to me that a flatly wrong finding by the IJ would compel a reasonable adjudicator to reach a contrary conclusion. The majority wishes away the IJ's error by deeming the letter "insufficient." They do not explain why this is so.

[15] Although Toualy's is the only other account which involves a bundle of wires with a tennis ball at the end, a brief

This corroborating evidence, which the IJ ignored, compels remand in my view.

## Plausible Implausibilities

Next the majority defers to the IJ's finding of chronological "implausibilities" that supported his adverse credibility finding. When reviewing credibility determinations based on discrepancies or implausibilities, we normally conduct a three-pronged analysis: first, we determine whether "the discrepancies articulated by the IJ and/or the BIA are actually present in the administrative record"; second, we look to whether "the discrepancies generate specific and cogent reasons from which to infer that petitioner or his witnesses provided non-creditworthy testimony"; and third, we examine whether the "petitioner failed to provide a persuasive explanation for these discrepancies." Cuko, 522 F.3d at 37.

The IJ's finding glaringly fails the second prong. The IJ found it "implausib[le] . . . that the respondent would be arrested and beaten eight years after his protest march in February of 1992." The purported chronological implausibility also included the six-week gap between Dehonzai's statements at work and his second detention. The IJ's reasoning for finding

catalogue illustrates the depraved creativity of the Ivorian regime. In addition to iron bars, whips, and wire bundles, members of the military and police used the following implements to conduct beatings at various times: boards with nails, whips, truncheons, rifle butts, sticks, belts, and branches.

-37-

these implausible was that "the chronology just does not work." This analysis does not set forth any specific and cogent reason as to why the chronology should be viewed as implausible in order to support an adverse credibility determination. See Cuko, 522 F.3d at 37; see also Wiratama, 538 F.3d at 4. Indeed, not once in these proceedings has anyone posited an actual rationale for why this "chronology just does not work." Any reasonable adjudicator would be compelled to find the IJ's conclusion a baseless tautology; deferring to this shell of a legal analysis renders our review meaningless.

## What Evasive Demeanor?

Next the majority defers to the IJ's "observ[ation] that the respondent's demeanor and manner of response to the straightforward questions was frequently evasive and respondent seemed to intentionally misunderstand the questions that were direct." Despite the IJ's invocation of the word "demeanor," it is clear from his analysis – relying on evasiveness and apparently intentional misunderstandings – that the IJ was actually referring to Dehonzai's manner of responding to questions rather than his physical appearance on the stand. Indeed, there is no discussion in the decision of any physical manifestation of Dehonzai's demeanor that would support an adverse credibility determination on that ground. I would therefore proceed under the rule that credibility determinations

that "rest 'on an analysis of the petitioner's testimony and not her demeanor . . . receive less than usual deference.'" Wiratama, 538 F.3d at 4 (quoting Heng v. Gonzales, 493 F.3d 46, 48 (1st Cir. 2007)).

Dehonzai appears from the record to have candidly discussed every topic that arose in questioning.[16]  A review of his candid responses would entail a regurgitation of the whole of his testimony, but it is worth noting that even the name on his friend's passport, which he withheld for some time out of fear for his friend's well-being, was eventually relinquished.  In fact, the only specific evidence the IJ pointed to in support of his finding that Dehonzai was evasive is that Dehonzai "g[ave] no detail whatsoever, regarding the effect of his arrest and subsequent hiding with Jean Baptiste, in terms of the effect it must have had on his wife and children."  Here, the IJ seems to be calling for speculation rather than testimony.  Dehonzai testified that he had no contact with his wife, but that "if my life is in danger, she went to her parents."  He also testified that he did not know for certain where his wife or children were,

---

[16]  Even the portions of Dehonzai's testimony that seem most to have troubled the IJ – where the IJ was asking about the circumstances under which Dehonzai was fired from his job – are remarkably consistent.  Dehonzai first testified that the firing was politically motivated, then attempted to explain the political motivation, then, when prompted to limit his answer to one sentence, he did so: "Well, when I criticized the military who had beaten my cousin, and I did, I expressed this criticism in the workplace."

and that logistically he could not have brought his family to safety here. It does not appear from the record that the IJ or counsel sought any further information or detail during this exchange. Thus, Dehonzai's testimony regarding his family was hardly evasive, and the IJ's reliance on this testimony simply makes no sense. Any reasonable adjudicator would be compelled to conclude that Dehonzai was not evasive.

### Overlooked Evidence

The majority next mentions that Dehonzai had plenty of notice "of the need to buttress his case." In fact, he did so. Given our mandate to review the record as a whole, we ought to take a look at the swaths of relevant material in the record that the IJ and BIA skipped over in rendering their decisions. Some of this material was specific to Dehonzai, including the Toualy letter and the potential arrest warrant.[17] This relevant

---

[17] The government ridiculed and the IJ dismissed a French-language document which Dehonzai suggested was an arrest warrant, making reference to the translation of that document as a "certificate of investigation" indicating that Dehonzai "was investigated for political activity." It is true that most repressive regimes likely would not issue certificates indicating that they had investigated individuals for political activity. However, my own reference to the online version of the Pocket Oxford-Hachette French Dictionary indicates that the French phrase "est recherché," which was translated as "was investigated," is also an idiom for "is wanted," as in: "il est recherché par la police: he's wanted by the police." See recherché, Dictionaire Français-Anglais WordReference.com. Thus, the phrase "est recherché" in the purported warrant appears better translated as "is wanted" rather than "was investigated," and the possibility that the document actually is an arrest warrant is suddenly bolstered.

Corroborating evidence from the country reports documenting

-40-

evidence deserved thoughtful consideration; instead, it received out-of-hand rejections on irrelevant grounds.

More importantly, however, the IJ and BIA appear to have ignored the Amnesty International and State Department country reports (with the sole and notable exception of the much-discussed Jules Toualy quote) that make up much of the record. Although DHS regulations no longer expressly require a credibility determination to be conducted "in light of general conditions in the applicant's country of nationality," 8 C.F.R. § 208.13 (1997) (superseded by current version), we may still find error where the IJ and BIA "unreasonably ignored these reports, and gave no explanation for why [they] did so." Mukamusoni, 390 F.3d at 124. Indeed, "[s]uch documentary evidence is extremely important for contextualizing, in the absence of direct corroboration, the events which [an applicant] claims constitute persecution." Id. (internal quotation marks removed). This context can help a fact-finder in the "endeavor not to allow preconceptions garnered from life in the United States to color [an] evaluation of events that took place in foreign lands."

the proliferation of free-form warrants further counsels that we reject the IJ's careless dismissal of this document. See Sok, 526 F.3d at 55 (remanding where the record contained some support for the petitioner but none for the IJ's assumption). And as to the majority's suggestion that argument regarding the warrant is waived, Dehonzai's brief discusses the warrant at pages 5-6, argues that he produced ample evidence to support his fear of arrest at page 13, and discusses the corroborative value of the country report at pages 14-15.

<u>Sok</u>, 526 F.3d at 56.  Such nuance was and is lacking in the IJ, BIA, and majority's respective reviews.

To sum up my view, this is the sort of case where "the IJ and [BIA] misstate[d] [an immigrant's] testimony, appl[ied] labels (like inconsistent and evasive) that are at odds with what the transcript shows, and dr[e]w inferences that appear wholly speculative and without record support." <u>Castaneda-Castillo</u>, 488 F.3d at 24.  Indeed, I have examined "the IJ's and [BIA]'s grounds and f[ou]nd each flawed to varying degrees." <u>Kartasheva</u>, 582 F.3d at 106.  Thus, I at least "cannot conscientiously find that the evidence supporting that decision is substantial," and I think we ought to overturn the IJ's and BIA's decisions and remand for a determination of the merits of Dehonzai's asylum application.  <u>See</u> <u>Sok</u>, 523 F.3d at 53.

Put another way: "the whole sometimes can exceed the sum of the parts," as the majority quotes <u>Mariko</u> v. <u>Holder</u>, 621 F.3d 1, 6 (1st Cir. 2011); here, if each of the immigration courts' errors were individually a rotting fish, the whole of their decisions' stench would be truly unbearable.

## Conclusion

If our review began and ended with deference, then there would be no point to the exercise.  Instead, the law directs us to remand when the immigration courts pass down erroneous or deficient decisions.  Today my colleagues avert

their eyes from such errors and deficiencies in the name of deference, with the result that Dehonzai will be cast into the middle of the very turmoil that led him to seek refuge with our own Mother of Exiles in the first place.  I cannot, and therefore dissent.